UNITED STATES of America, ex rel. Lance E. HAFTER, D.O., and George R. Schwartz, M.D., Plaintiffs,

v.

SPECTRUM EMERGENCY CARE, INC., now known as Spectrum Healthcare Resources, Inc.; Aramark Corporation; Aramark Services, Inc.; Spectrum Healthcare Services of Delaware, Inc., a/k/a Spectrum Healthcare Services, Inc.; Spectrum Emergency Care, Inc.; Emcare Holdings, Inc.; American Medical Response, Inc.; Laidlaw Transit, Inc.; and Laidlaw, Inc., Defendants.

No. 96–1095–JTM.

United States District Court, D. Kansas.

June 30, 1998.

---

Mark B. Hutton, Derek S. Casey, Christopher P. Christian, Channel P. Townsley, III, Hutton & Hutton, Wichita, KS, Richard L. Schodorf, Office of U.S. Attorney, Wichita, KS, for Lance E. Hafter and George R. Schwartz.

Robert L. Howard, Gary L. Ayers, Martha Aaron Ross, Foulston & Siefkin L.L.P., Wichita, KS, James W. Rankin, G. Christian Kronberg, Kirkland & Ellis, Chicago, IL, Kathleen A. Buck, Dexter U. Nutall, Kirkland & Ellis, Washington, DC, for Spectrum Emergency Care, Inc. and Spectrum Health-Care Services of Delaware, Inc.

Gary L. Ayers, Martha Aaron Ross, Foulston & Siefkin L.L.P., Wichita, KS, James W. Rankin, G. Christian Kronberg, Kirkland & Ellis, Chicago, IL, Kathleen A. Buck, Dexter U. Nutall, Kirkland & Ellis, Washington, DC, for Aramark Services, Inc.

## MEMORANDUM ORDER

MARTEN, District Judge.

The present action involves a *qui tam* claim by Dr. Lance E. Hafter as relator under the False Claims Act, 31 U.S.C. § 3730(b). Hafter alleges that the defendants, Spectrum Emergency Care, Inc. and affiliated corporations defrauded the government by submission of false or fraudulent claims for reimbursement for emergency medical services under Medicare Part B, and that the claims as presented violated the Medicare Act, 42 U.S.C. § 1395(U)(b)(6). The defendants have moved to dismiss the action, arguing that Hafter does not meet the jurisdictional standards for a person entitled to bring a claim under the FCA.

The FCA authorizes private citizens to commence actions on behalf of the United States against persons who have presented false or fraudulent claims to the federal government. The FCA also encourages such actions by providing the citizens commencing the actions, known as "relators," with a monetary incentive by permitting them an award of a percentage of the monies found to be paid as false claims. Throughout its history, and particularly since amendments to the statute in 1986, the FCA has required careful attention from the courts, as they have attempted to balance the governmental interest of encouraging whistleblowers, while simultaneously excluding parasitic litigation.

> *Qui tam* provisions are designed to set up incentives to supplement government enforcement, and at their best may "compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel." *United States v. Griswold,* 24 F. 361, 366 (D.Or.1885). On the downside, overly generous *qui tam* provisions present the danger of parasitic exploitation of the public coffers, as exemplified by the notorious plaintiff who copied the information on which his *qui tam* suit was based from the government's own criminal indictment. *See United States ex rel. Marcus v.*

> *Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Seeking the golden mean between adequate incentives for whistleblowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own, Congress has frequently altered its course in drafting and amending the *qui tam* provisions since initial passage of the FCA over a century ago.

*United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 649 (D.C.Cir. 1994).

The present case involves just such a balancing. Currently the single issue [1] before the court is narrowly drawn and does not involve a complicated set of facts: whether the court has jurisdiction under the FCA to hear Hafter's claims. The court finds that two alternate grounds support dismissal of the action. Although at the current time only defendants' initial motion to dismiss the Amended Complaint has been fully briefed, the court has reviewed plaintiffs' Second Amended Complaint and finds it to be equally defective in providing the court with jurisdiction.

The defendants' motion is premised on their argument that the present action does not reflect a valid *qui tam* claim in which the respondent is a whistleblower raising new claims of fraud, but is simply repeating allegations previously advanced in a Texas malpractice action, *Mallory v. Dallas/Fort Worth Medical Center,* Case No. 153–147424–93. Under 31 U.S.C. § 3730(e)(4)(A),

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person

---

1. The defendants also present an additional argument that the action should be dismissed because Hafter has failed to identify the alleged fraud with particularity as required by Fed.R.Civ.P. 9(b). The court finds this is not a substantial basis for dismissing the action, since (1) the Amended Complaint and Second Amended Complaint fairly spell out the nature of the alleged fraud, (2) most of the evidence of fraud is under the defendants' control, so the rule of particularity is relaxed, and (3) in any event, the preferred solution would be to allow amendment rather than impose dismissal.

bringing the action is an original source of the information.

The defendants contend that the substance of the claims Hafter advances here were previously advanced in the pleadings and depositions filed in *Mallory,* and that as the information was previously publicly disclosed, any FCA action now is barred.

Between 1988 and 1993, Hafter was employed as the Medical Director of Texas Emergency Room Services, Inc., which had contracted with Dallas/Fort Worth Medical Center for the provision of emergency room services. TERS in turn contracted with Spectrum for the provision of managerial services and credentialing.

On March 14, 1993, Texas attorney Cameron Spradling filed a malpractice action on behalf of Nikkie Mallory against the medical center, Spectrum, and, among other individuals, Dr. James Chepko. On November 22, 1994, Spradling contacted the relator herein, Dr. Lance Hafter. Hafter has attached an extensive affidavit from Spradling to his response to the motion to dismiss.

As the affidavit makes clear, Hafter provided Spradling with extensive complaints about Spectrum's handling of emergency room services at the medical center. According to Hafter, TERS was actually a sham entity, and Spectrum used its position to control the contract physicians, and, notwithstanding statements to the contrary, tells the physicians how to practice medicine. Hafter states that Spectrum kept 20% to 30% of the fees generated by the physicians as a management fee, even though the physicians did all the quality assurance. Further, Hafter told Spradling there had been complaints from patients that they had only been seen by an intern or by medical school students, not by residents. Spradling states in his affidavit that he used Hafter's allegation to modify what had been a standard malpractice claim to add charges of violating the Texas Medical Practices Act.

A comparison of the specific allegations made in the present action in both the Amended Complaint and the Second Amended Complaint with the pleadings or filed depositions in *Mallory* render it impossible to argue that the allegations in the present case were not based on the information publicly disclosed in that case. The Tenth Circuit has explicitly concluded that "[a]llegations disclosed via civil litigation, congressional hearings and the news media fall within the scope of public disclosure as contemplated" by the FCA. *Precision,* 971 F.2d at 554 n. 5. In contrast, relator makes no substantial argument in his response that there has not been public disclosure of at least part of the information which forms the basis for his claim here. Indeed, the response brief implicitly concedes the point. (Rel. Br. at 7). Hafter argues, however, that he is still entitled to bring the present action under the FCA since he is the "original source" of the *Mallory* allegations.

Since the present action is based upon publicly disclosed allegations or transactions, jurisdiction is proper only if Hafter can demonstrate that he is "an original source of the information." 31 U.S.C. § 3730(e)(4)(A). The statute defines the term expressly as

> an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(B).

 The statute thus requires both direct and independent knowledge of the information on which the allegations are based and that the relator voluntarily provide the information to the government prior to filing suit. *United States ex rel. Fine v. MK-Ferguson Co.,* 99 F.3d 1538 (10th Cir.1996); *U.S. ex rel. Fine v. Advanced Sciences, Inc.,* 99 F.3d 1000, 1006 (10th Cir.1996); *United States ex rel. Precision Co. v. Koch Industries,* 971 F.2d 548 (10th Cir.1992). The court concluded in *Precision* that these requirements were "plain, unambiguous and require no further scrutiny." 971 F.2d at 553. Direct knowledge means "knowledge gained by the relator's own efforts and not acquired from the labors of others." *Fine,* 99 F.3d at 1006–07. "[T]o be independent, the relator's knowledge must not be derivative of the information of others, even if those others may qualify as original sources."

*Id.,* at 1007. In *MK–Ferguson,* the court observed:

> Other courts have held that direct and independent knowledge is " 'marked by [the] absence of an intervening agency.' " *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1160 (3d Cir.1991) (quoting Webster's Third New Int'l Dictionary 640 (1976)). Furthermore, the Ninth Circuit characterizes direct and independent knowledge as "unmediated by anything but [the relator's] own labor." *Wang v. FMC Corp.,* 975 F.2d 1412, 1417 (9th Cir.1992). Moreover, independent knowledge is knowledge which is not secondhand knowledge. *See Prudential,* 944 F.2d at 1154 (holding Congress intended "to encourage persons with first-hand knowledge of fraudulent misconduct to report fraud").

99 F.3d at 1547.

The court finds Hafter does not have direct and independent knowledge of the information on which the allegations are based which would qualify him as an original source under the law. Although the Spradling affidavit makes clear that Hafter provided him with a great deal of negative information against Spectrum, the clear focus of that action was on the supposed violation of the Texas Medical Practices Act, not any alleged Medicare fraud.

Indeed, when it comes to Medicare fraud or fraudulent billing, Hafter's information to Spradling was decidedly indirect. Thus, Spradling states that "Dr. Hafter told me that *Dr. Chepko said* that he did not physically see Nikkie Mallory." (Aff. at ¶ 35) (emphasis added). And Spradling states that "Dr. Hafter was aware that Nikkie Mallory had Champus benefits and *suggested concern* that an improper claim had been filed on the government, as Mr. Mallory was not seen and treated by Dr. Chepko." (Aff. at ¶ 36) (emphasis added). There is no indication Dr. Hafter had any personal knowledge of Spectrum's billing practices, or that he undertook any investigation of them. This lack of knowledge can also be seen in the relator's response to the defendants' argument that he has failed to plead fraud with the particularity required by Rule 9(b): " . . . the Defendants' demand for evidentiary detail is contrary to the general principle that the requirements of Rule 9(b) are relaxed where information is only within the opposing party's knowledge. Spectrum, not the Relator, has control over its own contracts and records of claims filed with the government." (Resp. Br. at 19, citations omitted).

In his response, Hafter relies on the decision in *United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 657 (D.C.Cir.1994), where the court held that the original source provision "does not require that the *qui tam* relator possess direct and independent knowledge of *all* of the vital ingredients to a fraudulent *transaction.*" The court ruled it was sufficient if the relator had independent knowledge of any of the essential ingredients of the fraud. *Springfield Terminal* does support Hafter's position and could serve as a basis for a finding that Hafter's limited knowledge of the alleged fraud would grant the court jurisdiction to hear the present action. But this court finds such a conclusion is inappropriate for several reasons.

First, the *Springfield Terminal* approach is inconsistent with the plain language of the FCA, which should govern the court's interpretation. *Precision,* 971 F.2d at 552. As noted earlier, the statute provides that an original source is someone who has "direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B) (emphasis added). The statute does not provide that all that is necessary is that the relator have "direct and independent knowledge of *some of* the information on which the allegations are based." Even with the understanding that "based" should be construed to be "supporting" (*see Precision,* 971 F.2d at 552 (construing § 3730(e)(4)(A)) and discussion infra), there is no indication in the language of the statute that the supporting information need only provide a fraction of the necessary elements of the allegation.

The analysis in *Springfield Terminal* has not been adopted by any circuit other than the D.C. Circuit. In contrast, the Tenth Circuit has tended towards a relatively more

narrow interpretation of the FCA. For example, courts have differed in their interpretations of when, under the FCA, a relator's claims should be deemed to be barred because they were "based on" prior disclosures. In contrast with the Fourth Circuit, which interpreted this language narrowly as meaning "derived from" (and thereby minimizing the number of relators' claims which would be barred by the public disclosure rule), *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1349 (4th Cir.), *cert. denied*, 513 U.S. 928, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994), the Tenth Circuit explicitly rejected this approach, concluding that a relator's claims were "based upon" prior public disclosures whenever they are "supported by" the earlier disclosures. *Precision*, 971 F.2d at 552. That is, the bar applies if the *qui tam* claims are "substantially identical" to the public disclosures, even if the relator did not in fact obtain his information of the fraud from the disclosures. *Id.*, at 553–54. In the same decision, the court also rejected an argument that the bar for actions based upon prior public disclosures should be understood to apply only if the relator's action was based "solely" on the public disclosure. *Id.*, at 553 n. 3. The bar applies, the court held, if the *"qui tam* action is based in any part upon publicly disclosed allegations or transactions." *Id.*, at 553.

Of course, in this context *Precision* dealt with the "quick trigger" of the public disclosure bar, rather than the "more exacting" analysis required by the original source provision. *Id.*, at 552. But the rationale adopted by the court is applicable here as well. As the court later wrote in *MK–Ferguson*, "where public disclosure of the fraud has already occurred, no incentive for a private *qui tam* suit is needed." 99 F.3d at 1546. To allow FCA *qui tam* actions which were even partially based on public disclosures, "would dramatically alter the plain meaning of the False Claims Act by greatly expanding federal jurisdiction [and] would add extra claims not supported by the public disclosure to avoid the jurisdictional bar." *Id.*, at 1546–47 (citing *Precision*, 971 F.2d at 552).

In addition, the analysis in *Springfield Terminal*, which would allow original source status to anyone who could point to having some knowledge of either any element of the fraud transaction or the general existence of fraud (or, in *Springfield Terminal*'s algebraic terminology, 14 F.3d at 654 (emphasis removed) any knowledge of any of the letters of "X + Y = Z [where] Z represents the allegation of fraud and X and Y represent its essential elements"), would appear to be inconsistent with the result of the Tenth Circuit's ruling in the *Fine* cases. For example, in *MK–Ferguson*, the relator argued that, because he was the first to identify false costs submitted by the defendant as fraud or false claims, his action was either not barred under the public disclosure bar expression, or was saved by his status as an original source. The Tenth Circuit rejected both arguments and upheld dismissal of Fine's claim. As to the argument that there was no public disclosure, the court wrote:

> Fine focuses on the conclusions of the final report and audit, which are worded in terms of "unallowable" or "unreasonable" costs, and contends these conclusions do not constitute allegations of fraud. He maintains his Complaint constitutes the first allegations of fraud.
>
> Comparing the conclusions of the final report and audit concerning unreasonable and unallowable costs with the allegations in Fine's Complaint, we hold that the two are substantially identical. The final report and audit concludes that certain cost items exceeded reasonable amounts by specific dollar amounts. Fine's Complaint does the same, with the semantic difference that he calls these amounts false claims. That Fine first used the label "false claims" is immaterial.

99 F.3d at 1547 (citation omitted). As to the original source argument, the court rejected it since, not only was Fine's "investigation" dependent on the findings of others, he "has merely changed the labels 'unreasonable' and 'unallowable' costs from the final report and audit to 'false' and 'fraudulent' claims." *Id.*, at 1548.

The court finds that a relator claiming original source status after public disclosure must demonstrate that he had some direct and independent knowledge as to all the essential elements of the claim. Such a requirement obviously, as the D.C. Circuit

Court noted in *Springfield Terminal*, would tend to reduce the number of persons who might be able to qualify as an original source under the FCA. But the resulting effect is surely overstated and many relators would still qualify as original sources. All that is required is that the source have some independent and direct knowledge of false or misleading statements conveyed as claims to the government. This requirement is consistent with the language of the statute.

It would also be consistent with the purpose of the statute in avoiding parasitic claims which do not advance the government interest of policing fraud and false claims. And the present case would appear to reflect precisely the type of litigation which fails to advance any significant government interest. The relator Hafter did not conduct any investigation of Spectrum's billing practices, and at no time during his employment at TERS did he report any concerns to the government. Rather, his actions were entirely passive, volunteering information only at the end of his status as a medical director and after he was contacted by an attorney in a separate civil proceeding. This contact occurred in 1994, and publicly disclosed depositions of other persons relating to Hafter's charges involving Spectrum were conducted shortly thereafter. Nonetheless, there is no indication that Hafter again either independently attempted to conduct any investigation to acquire personal knowledge of Spectrum's billing practices, or attempted to alert the government.[2] Only after the passage of a substantial amount of time have the general allegations of misconduct in *Mallory* been repackaged as Medicare fraud and submitted here. Hafter has done little to justify the title of "whistle blower," in the sense that the FCA seeks to encourage such persons.

There is a second, independent basis for dismissing the present action. The circuits have reached different conclusions as to the role that an original source must have played in the public disclosure of the information. The Second and Ninth Circuits have concluded that the relator must have been a source, directly or indirectly, of the entity which publicly disclosed the allegations. *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir.1990); *Wang v. FMC Corp.*, 975 F.2d 1412, 1418 (9th Cir. 1992). The Eleventh and Fourth Circuits have concluded that an original source need not be a source of the public disclosures, so long as she has independent and direct knowledge of the information supporting the allegations. *Cooper v. Blue Cross and Blue Shield*, 19 F.3d 562, 568 (11th Cir.1994); *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1355 (4th Cir.1994). The Tenth Circuit has refrained twice from deciding the issue of the degree, if any, which a putative original source must play in the public disclosure. *See Fine v. MK–Ferguson*, 99 F.3d 1538, 1548 n. 2 (10th Cir.1996); *Precision*, 971 F.2d 548, 553 (10th Cir.1992).

Recently, two circuits have adopted a third approach. In *United States ex rel. Findley v. FPC–Boron Employees Club*, 105 F.3d 675, 690–91 (D.C.Cir.) *cert. denied*, —— U.S. ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997), the court agreed that there was no requirement that the relator, to qualify as an original source, be the source of the public disclosure. However, the court also stated:

It is clear to us that an "original source" must provide the government with the information prior to any public disclosure. We previously noted that the government notice part of the "original source" exception may appear extraneous in light of the statute's filing provisions, which require cases to be filed under seal for a period of at least sixty days and served only on the government. The "original source" government notification provision is not super-

---

**2.** The defendants have also moved to dismiss under § 3730(e)(4)(B), arguing Hafter did not provide the information to the government "before filing an action." And, indeed, the relator's complaint states that Hafter was notifying the government of his allegations "concurrently" before the filing of the complaint. In his response to the Motion to Dismiss the Amended Complaint, Hafter has attached an affidavit from counsel which acknowledges this statement in the Complaint, but asserts that it did provide information to the government prior to the filing of the complaint. Even assuming the court was to accept the affidavit and ignore the plain statement in the Complaint, and therefore not dismiss the Complaint on those grounds alone, the fact remains that Hafter has failed to show any significant effort to provide timely information of fraud to the government.

fluous, however, for it serves an entirely different purpose from the statute's filing and government notice provisions. By protecting a party who initially exposes fraud to the government, Congress "corrected" the holding of *United States ex rel. State of Wisconsin v. Dean* [,729 F.2d 1100 (7th Cir.1984)]. Once the information has been publicly disclosed, however, there is little need for the incentive provided by a *qui tam* action. Thus, the only reading of the statute that accounts for the requirement that an "original source" voluntarily provide information to the government before filing suit, and Congress' decision to use the term "original source" rather than simply incorporating subparagraph (B)'s description into subparagraph (A), is one that requires an original source to provide the information to the government prior to any public disclosure.

105 F.3d at 690–91. The court then concluded that the relator could not be an original source, since he did not learn any information relating to the alleged fraud until after the public disclosures.

The Sixth Circuit adopted the same understanding of the FCA in *U.S. ex rel. McKenzie v. Bellsouth Telecommunications, Inc.*, 123 F.3d 935 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998). The court noted that although it had not previously had occasion to define the term "original source," it had observed in *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1035 (6th Cir.1994) that a relator "must be a true 'whistle blower'; therefore, he is precluded from collecting a bounty if the case is brought on the basis of information that has already been publicly disclosed, or if someone else has filed the claim first." The *McKenzie* court stated:

> We find it difficult to understand how one can be a "true whistleblower" unless she is responsible for alerting the government to the alleged fraud before such information is in the public domain. Therefore, we adopt the approach of the District of Columbia Circuit and conclude that, to be an original source, a relator must inform the government of the alleged fraud before the information has been publicly disclosed.

We reach this conclusion based on Congress's purpose in amending the Act and the plain meaning of the Act. Before the 1986 amendments, jurisdiction under the FCA had experienced two extremes: The original statute which allowed suits to proceed even though they had been copied from federal indictments, and the 1943 amendments to the Act, which precluded all suits in which the government already had knowledge of the fraud even if that knowledge came from the relator. *See United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943); *United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100, 1106 (7th Cir.1984).

"The purpose of the qui tam provisions of the FCA is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward." H.R.REP. NO. 660, 99th Cong., 2d Sess. 22 (1986). The interpretation of "original source" adopted by this Court today is consistent with this goal and "is most likely to bring 'wrongdoing to light' since, by barring those who come forward only after public disclosure of possible False Claims Act violations from acting as qui tam plaintiffs, it discourages persons with relevant information from remaining silent and encourages them to report such information at the earliest possible time." *Dick,* 912 F.2d at 18.

At the same time, this approach furthers Congress's second goal in amending the FCA: "[T]o prevent 'parasitic' qui tam actions in which relators, rather than bringing to light independently discovered information of fraud, simply feed off of previous disclosures of government fraud." *Siller,* 21 F.3d at 1347. Anyone who alerts the government and is a "true whistleblower" deserves any reward that may be obtained by pursuing a qui tam action under the FCA. However, the individual who sits on the sidelines while others disclose the allegations that form the basis of her complaint should not be able to participate in any award. This would be contrary to the purpose of the statute.

In adopting the D.C. Circuit's approach over that of the Second and Ninth Circuits

we conclude that, although both approaches require that the relator be the first to "blow the whistle," the D .C. Circuit's requirements do more to promote the FCA's mission—to alert the government that a fraud is being perpetrated against it. The statute's requirement that a relator file his or her action under seal for the U.S. Attorney's Office to review before proceeding with the action supports this interpretation. The government has the clearest interest in the information and the FCA was designed to give whistleblowers the incentive to provide the government with such information. Further, this interpretation protects the "true whistleblower," the person who reports fraud to the government before it is publicly disclosed; by allowing her to maintain a qui tam action. As the court explained in *Findley,* "[a] person who provided information to the government that subsequently was uncovered by a reporter and printed in the newspaper would still be able to maintain a qui tam action." *Findley,* 105 F.3d at 690.

To qualify as an original source, the relator must have direct and independent knowledge of the information on which the publicly disclosed allegations are based. In addition, the relator must provide the government with the information prior to any public disclosure. There is no additional requirement that the relator be responsible for providing the information to the entity that publicly disclosed the allegation of fraud as long as the relator provides the information to the government prior to any public disclosure.

123 F.3d at 942–43.

■ Applying this standard here, it is clear that Hafter cannot qualify as an original source, since he voluntarily engaged in assisting in the public disclosure of allegations against Spectrum in 1994, long before attempting to notify the government. In no meaningful sense can the relator be understood to be a true whistleblower. Accordingly, the present action cannot be maintained.

IT IS ACCORDINGLY ORDERED this <u>30th</u> day of June, 1998 that the defendants' motions to dismiss (Dkt. Nos. 22 and 43) are hereby granted and the present action is dismissed.