UNITED STATES of America ex rel. Delia Louise EATON, Administratrix of the Estate of Rev. Stanley R. Shrout, Plaintiffs,

v.

KANSAS HEALTHCARE INVESTORS, II, L.P., a Georgia Limited Partnership, Kansas Healthcare Investors, L.P., a Georgia Limited Partnership, Healthprime, Inc., a Georgia corporation, HP/Kansas, Inc., a Georgia corporation, Regency Health Care Centers, Inc., a Florida corporation, Defendants.

No. 96–1427–WEB.

United States District Court, D. Kansas.

Aug. 27, 1998.

Marlys A. Marshall, Los Lunas, NM, Jon S. Womack, Powell and Brewer, LLP, Wichita, KS, Verlin A. Ingram, Wichita, KS, for Della Louise Eaton.

Richard L. Schodorf, Office of U.S. Attorney, Wichita, KS, for U.S.

Lee H. Woodard, Robert W. Parnacott, Teresa L. Mah, Woodard, Hernandez, Roth & Day, Wichita, KS, for Kansas Healthcare Investors, Kansas Health Care Investors, Healthprime Inc. and HP/Kansas Inc.

Robert C. Brown, Brown, Dengler, Good & Rider, L.C., Wichita, KS, for Verlin A. Ingram.

Jon S. Womack, Powell and Brewer, LLP, Wichita, KS.

*Memorandum and Order*

WESLEY E. BROWN, Senior District Judge.

This matter came before the court on the defendants' motion to dismiss the Second Amended Complaint.[1] (Doc. 61). Having heard the arguments of the parties and reviewed the relevant materials, the court is now prepared to rule. For the reasons set forth herein, the court finds that the motion should be granted.

The Second Amended Complaint asserts a claim under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–33, brought on behalf of the United States under the qui tam provisions of § 3730(b)(1). The relator is the administratrix of the estate of the Rev. Stanley Shrout, who prior to his death was a resident of River Park Health Care (formerly Regency Health Care Center). River Park is an adult care home in Wichita in which the defendants possessed an interest. Plaintiff alleges that the defendants provided grossly negligent care to Rev. Shrout, and that in connection with such care they knowingly submitted false or fraudulent claims for payment to the United States under federally funded Medicaid programs.

One of the arguments raised by the defendants in their motion to dismiss is that the court lacks jurisdiction by virtue of 31 U.S.C. § 3730(e)(4)(A). That section, which applies to actions under the False Claims Act, provides:

> No court shall have jurisdiction over an action under this section which is based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*Id.* "Original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information. § 3730(e)(4)(B). Defendants contend that the action is based on information that was publicly disclosed and that plaintiff is not the original source of the information.

Both parties have submitted materials outside of the pleadings in connection with this argument. The court has considered these materials and therefore treats the motion as one for summary judgment under Fed. R.Civ.P. 56. *See United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1518 (10th Cir.1996).

*Facts.*

In December of 1992, the Wichita Eagle newspaper reported that Kansas state health officials (of the Kansas Department of Health and Environment, or "KDHE") had banned new admissions to the Regency Health Care Center after an inspection produced an eighty-one page list of complaints about the home. Def.App.Exh. I. The article mentioned a number of unsanitary conditions found at the home, and stated that one resident had lost a large amount of weight shortly after being admitted. The article noted that most of the residents of the home were on Medicaid, and that the government paid Regency $49.76 per day per resident, or about $1.9 million a year in federal funds. The article indicated that Regency had just been sold to a new group of investors, which apparently included the defendants.

A follow-up article in the Eagle a few weeks later reported that state officials refused to lift the sanctions because many of the problems at the home had not been corrected. Def.App.Exh. I. The article mentioned that the home had been sanctioned for not employing enough nurses, and that the administrator for the home was trying to address the problems cited by KDHE, including hiring additional staff. The article stated that several residents were seen ei-

---

1. At the August 18, 1998, motions hearing, the court granted the plaintiff leave to file the Second Amended Complaint and denied the defendants' motion to strike that complaint. In view of those rulings, counsel for the defendants asked the court to consider its motion to dismiss as it applies to the Second Amended Complaint.

ther sleeping through their meals or not eating and that records showed many of these residents were losing weight. It also mentioned that KDHE had discovered bedsores on at least sixteen patients. The article again mentioned that most of the residents in the home were on Medicaid and that the home received $1.9 million per year from Medicaid.

In January of 1996, a suit was filed against the defendants in the district court of the Eighteenth Judicial District of Kansas on behalf of Rev. Shrout by Della Louise Eaton, who was the guardian and conservator for Rev. Shrout, and by Rev. Shrout's children. The complaint contained claims for negligence, breach of contract, and intentional infliction of emotional distress. Def. App.Exh. A. It alleged that the defendants were responsible for complying with the federal and state regulations governing operation of such homes, including Title 42 of the Code of Federal Regulations. *Id.* at 3. It noted that the defendants charged and collected money for the care and treatment of Rev. Shrout from his Medicaid account. *Id.* The complaint alleged that the defendants were negligent for failing to comply with the Code of Federal Regulations and other applicable laws. *Id.* at 4. The complaint stated that the family of Rev. Shrout had filed numerous complaints with the KDHE and that due in part to these complaints KDHE had cited the care home for numerous deficiencies. *Id.* at 5–6. The complaint detailed the correction orders and penalties issued by KDHE and noted that on several occasions in 1994 and 1995 KDHE inspectors discovered violations affecting the safety and health of residents of the home. The complaint noted that in 1994 KDHE found that the home was not in compliance with certification requirements under the federal regulations. *Id.* at 7. The complaint included a three-page list of alleged negligent acts said to be in violation of numerous provisions of the Code of Federal Regulations. *Id.* at 10–13.

On May 21, 1996, another suit was filed against the defendants in state court by the conservator of Leona Miller, another resident of the care home. Def.App.Exh. E. Attorney Jon Womack, who had filed the suit on behalf of Rev. Shrout, also filed Ms. Miller's suit. The complaint in the Miller case was similar to the one filed on behalf of Rev. Shrout. Ms. Miller's complaint included additional allegations, however, including the following:

> The defendants actively sought patients with similar medical and nursing needs as Plaintiff in order to fill empty beds, increase their rate of occupancy and overall revenues. In fact, Leona Miller was the kind of resident whose care, paid for by the government, said Defendants actively sought in order to fill their empty beds and to increase [their] rate of occupancy. In an effort to assure that Leona Miller and other patients whose care was funded by the government were placed in River Park Health Care, the business Defendants held themselves out to the Kansas Department of Health and Environment and to the public at large as being [specially skilled, properly staffed, and able to meet the needs of Leona Miller and residents like her.]

> \* \* \* \* \* \*

> The Defendant, River Park Health Care, is a licensed nursing home, as such term is understood in law, and certified for participation in the Medicare and Medicaid programs as an intermediate and skilled care facility. By reason of its election to participate as a long term care provider Defendants were able to enjoy substantial revenues paid for by taxpayer funded programs. Not only did government programs provide Defendants with a guaranteed payment source, but also with the continual flow of residents whose care was paid for by the Medicaid program or some other taxpayer program. Having availed itself with the privileges and financial benefits available to licensed adult care home operators certified for participation in such programs, Defendants are and at all times material to this lawsuit were required to comply with ... the federal minimum standards of participation imposed by the United States Department of Health and Human Services, (42 Code of Federal Regulations Section, Part 430 et seq.)....

*Id.* at 4–5. The complaint went on to allege that Ms. Miller was certified as an eligible

participant of Medicaid and that the defendants were required to comply with the regulations in caring for her, and that the home was negligent because it violated, among other things, the federal regulations governing care for Medicaid beneficiaries. Like Rev. Shrout's complaint, Ms. Miller's complaint alleged that due in part to complaints filed by Leona Miller's family, River Park Health Care was cited by KDHE for various violations. The complaint detailed the same actions of KDHE that were set forth in Rev. Shrout's complaint. Ms. Miller's complaint also added several new claims, including one alleging that she was a third-party beneficiary of a contract between River Park and KDHE which River Park had entered in order to participate in the Medicaid program, and in which River Park had promised to abide by KDHE's regulations. The complaint also asserted a violation of the Kansas Consumer Protection Act based upon these and other representations, and stated that "the claims made by the Defendant to the government and to the family of the Plaintiff Leona Miller were deceptive" under the Consumer Protection Act. A claim for fraud was also alleged based on these and other representations.

On May 22, 1996, another complaint was filed in state court by Mr. Womack on behalf of Pearl E. Fayette, another resident of River Park Health Care. Def.App.Exh. F. A fourth such complaint was filed on behalf of resident Johnnie Vera Moore on or before May 29, 1996. Def.App.Exh. G.

Plaintiff has submitted an affidavit of Assistant U.S. Attorney Richard Schodorf, which indicates that Schodorf met with Mr. Womack on October 16, 1996, and at that time Womack disclosed all of the information they had concerning the case. Mr. Schodorf states that he "was aware of no ongoing independent active investigation of the facts alleged in this case prior to the time of the disclosure of said facts by the relators, (plaintiffs) herein." Pl. Attachment.

Plaintiff's state action was subsequently dismissed without prejudice. On November 26, 1996, plaintiff filed her complaint in this court reasserting the state law claims and adding a claim under the False Claims Act.

The state law claims were then settled and dismissed, leaving only the FCA claim. The thirty-eight page Second Amended Complaint contains most of the allegations referred to previously concerning the defendants' failure to provide care in accordance with the regulations. It includes allegations that Rev. Shrout lost weight due to malnutrition during his residency, that he suffered from bedsores, and that the substandard care he received was due in part to an inadequate number of staff at the home. In essence, the complaint alleges that each claim for payment submitted by the defendants to Medicaid was a false or fraudulent claim because each was "a certification of the Defendant's compliance with applicable state and federal regulations for care and treatment" of Rev. Shrout, and the defendants presented these claims knowing they were not in compliance, "with actual knowledge of information and in deliberate ignorance or reckless disregard of the truth or falsity [of] the information regarding care and treatment of Stanley Shrout" and "knowing that they had violated the . . . regulations in the care and treatment of" Rev. Shrout. *See* Doc. 65 at p. 21. Plaintiff further alleges that Rev. Shrout "was continually subjected to unreasonable risks of physical and mental harm . . . and the risk[s] of harm known by the defendants were sufficiently frequent and blatant . . . that it was improper for the defendant to admit Government insured residents into such an environment and to bill the Government payors for the care of these patients . . . ." *Id.* at 20–21. The complaint lists the regulations with which the defendants allegedly failed to comply.

The Second Amended Complaint alleges that the plaintiff has direct and independent knowledge of the information upon which the suit is based and that she qualifies as an original source under the False Claims Act.

The Government has declined to take over the action. *See* 31 U.S.C. § 3730(a)(4)(B).

*Discussion.*

■ The qui tam provisions of the False Claims Act are designed to provide adequate incentives for "whistle-blowing" insiders with genuinely valuable information, while at the same time discouraging parasitic litigation by

plaintiffs who have no real significant information of their own to contribute. *United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 649 (D.C.Cir.1994). To achieve these ends, the statute bars suits that are based upon publicly disclosed allegations unless the plaintiff qualifies as an "original source" of the information.

■ Plaintiff does not appear to dispute that this action is based upon allegations or transactions that were publicly disclosed. Nor could such an argument be sustained on the record. The gist of plaintiff's claim—that River Park was billing Medicaid for substandard care to its residents—was clearly a matter publicly disclosed well before this suit was brought. Many of the transactions cited in the complaint were published in the newspaper and were investigated by the KDHE. Moreover, these transactions were the subject of plaintiff's civil action in state court. The disclosure of the underlying transactions through these means falls within the scope of "public disclosure" contemplated by § 3730(e)(4)(A). *See United States ex rel. Precision Co. v. Koch Industries,* 971 F.2d 548, 554 n. 5 (10th Cir.1992). Moreover, given the substantial identity between the two, it is likewise clear that plaintiff's action must be considered to be "based upon" these publicly disclosed allegations.[2] *See id.* at 553–54 (the bar applies if the qui tam claims are substantially identical to the public disclosures, even if the relator did not obtain his information of the fraud from the disclosures).

■ Given the foregoing, the court has no jurisdiction to hear the claim unless plaintiff shows that she is an "original source" of the information. The two requirements for being an original source are: 1) the relator must have direct and independent knowledge of the information on which the allegations are based; and 2) the relator must have voluntarily provided such information to the government prior to filing suit. *Precision,* 971 F.2d at 553. For the reasons below, the court concludes that plaintiff has failed to satisfy either of these requirements.

■ Direct knowledge means "knowledge gained by the relator's own efforts and not acquired from the labor of others." *United States ex rel. Fine v. Advanced Sciences, Inc.,* 99 F.3d 1000, 1006–07 (10th Cir.1996). To be independent, "the relator's knowledge must not be derivative of the information of others, even if those others may qualify as original sources." *Id.* at 1007. The Second Amended Complaint shows that a substantial amount of the information upon which the claim is based was gained from or was derivative of the information of others. For example, there was newspaper publicity as far back as 1992 disclosing the widespread deficiencies at River Park Health Care and the fact that Medicaid was paying for much of the care provided to the residents. While the newspaper did not specifically allege this to be fraud, it did make clear the fact that the government was being billed for substandard care. *Cf. MK–Ferguson,* 99 F.3d at 1547–48 (where report disclosed that the government was being billed for costs not allowable under a contract, the fact that the relator was the first to characterize them as fraudulent did not satisfy the direct and independent knowledge requirement) and *United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 687 (D.C.Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997) (the public disclosures were sufficient to raise the specter of foul play). The complaint also alleges that before the admission of Rev. Shrout to River Park, the defendants were notified of these deficiencies by employees, by relatives of residents, by residents, and by the KDHE. Doc. 65 at 17. It further alleges that "the same problems which beleaguered the care of the residents ... prior to Rev. Shrout's admis-

---

2. The fact that plaintiff's allegations focus specifically on Rev. Shrout does not mean the action is distinct from the prior public disclosures. The prior disclosures specifically identified the essential facts underlying plaintiff's fraud claim—i.e., billing Medicaid for substandard care given to residents at River Park Health Care. In this sense, plaintiff's claim is substantially identical to what was already publicly disclosed. *Cf. United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 687 (D.C.Cir.1997) (plaintiff's complaint substantially repeats what the public already knows and adds only the identity of particular clubs engaged in the questionable practice).

sion continued to plague residents, including Rev. Shrout from April 1, 1993 until February, 1996." *Id.* The complaint alleges, and the court accepts as true, that the family of Rev. Shrout personally observed examples of the shabby care that Rev. Shrout was receiving at the home, and that the family filed numerous complaints with KDHE. It is clear from the record, however, that others also observed such things and complained to KDHE as well. Def.App.Exhs. E, F & G. Clearly, a good number of the alleged regulatory violations upon which plaintiff relies were in fact investigated and made known by KDHE. The extensive involvement of KDHE in the investigation and documentation of the underlying facts is incompatible with plaintiff's claim to be an original source of the information. *See United States ex rel. Fine v. MK–Ferguson Co.,* 99 F.3d 1538, 1547 (10th Cir.1996) ("[D]irect and independent knowledge is 'marked by the absence of an intervening agency.' "). Although Rev. Shrout's family may have helped to spur KDHE's involvement, the information resulting from KDHE's investigation cannot be considered direct and independent knowledge of the plaintiff. *Cf. MK–Ferguson,* 99 F.3d at 1548 (relator's allegations were derivative of the facts uncovered by field auditors). Additionally, many of the allegations in the Second Amended Complaint (concerning the care home's use of Medicaid and its obligation to provide care in accordance with the federal regulations) first appeared in a complaint filed in state court on behalf of another resident. *See* Def.App.Exh. E at 4–5. Those same allegations were then added to Rev. Shrout's complaint. This type of collaborative effort is inconsistent with a claim of direct and independent knowledge. *See Wang v. FMC Corp.,* 975 F.2d 1412, 1417 (9th Cir.1992) (relator's knowledge must be "unmediated by anything but [the relator's] own labor"). In sum, the court concludes that plaintiff has failed to offer facts or proof that could satisfy the direct and independent knowledge requirement.

■ The second jurisdictional prerequisite is that the relator must have voluntarily provided such information to the government prior to filing suit. *Precision,* supra. As Judge Marten noted recently in *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.,* 9 F.Supp.2d 1273, 1998 WL 372466, No. 96–1095 (D.Kan., June 30, 1998), two circuit courts have interpreted this to mean that an original source must provide the government with the information prior to any public disclosure. *See United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 690–91 (D.C.Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997) and *United States ex rel. McKenzie v. Bellsouth Telecommunications, Inc.,* 123 F.3d 935, 942 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998). The court believes the Tenth Circuit would likely adopt this requirement. These other courts recognize, as does the Tenth Circuit, that "where public disclosure of the fraud has already occurred, no incentive for a private qui tam suit is needed." *See MK–Ferguson,* 99 F.3d at 1546. Moreover, such a requirement reduces the danger of parasitic litigation and encourages those with knowledge of fraud to come forward at the earliest possible time. *McKenzie,* 123 F.3d at 942–43. It is clear that plaintiff cannot satisfy this standard. The record is replete with public disclosure of the underlying transactions well before plaintiff provided the government with this information in October of 1996. Under the circumstances, the court concludes that plaintiff has failed to offer proof to satisfy the requirements of § 3730(e)(4)(A).

■ Because federal courts are courts of limited jurisdiction, it is presumed that no jurisdiction exists absent a showing of proof by the party asserting it. *Precision,* 971 F.2d at 551. As the party invoking jurisdiction, plaintiff had the burden of alleging the facts essential to jurisdiction and supporting the allegations by competent proof. *Id.* The court finds plaintiff has not met that burden. In view of the court's ruling, it is unnecessary to address the other arguments raised in defendants' motion to dismiss.

*Conclusion.*

Defendants' Motion to Dismiss the Second Amended Complaint (Doc. 61) is GRANTED and the plaintiff's claim under the False

Claims Act is hereby DISMISSED for lack of jurisdiction. IT IS SO ORDERED.