**UNITED STATES of America ex. rel. William GARIBALDI and Carlos Samuel**

**v.**

**ORLEANS PARISH SCHOOL BOARD.**

**Civil Action No. 96–0464.**

United States District Court, E.D. Louisiana.

Sept. 22, 1998.

from defendant when defendant is not otherwise obligated to pay damages to the homeowners.

William F. Wessel, Raymond R. Egan, III, Wessel & Associates, New Orleans, LA, for Plaintiffs.

Terrel J. Broussard, Bryan & Jupiter, New Orleans, LA, Ernest L. Jones, Elie, Jones & Gray, New Orleans, LA, for Defendant.

## ORDER AND REASONS

DUVAL, District Judge.

Before the Court are two motions for summary judgment filed by defendant, Orleans Parish School Board, one for lack of subject matter jurisdiction (Doc. # 64) and one for lack of evidence of fraudulent intent (Doc. # 69). The court finds summary judgment inappropriate under both theories. Each motion is discussed below.

## BACKGROUND

The phrase "qui tam" is a shortened version of the Latin phrase "qui tam pro domino rege, quam pro se ipso in hac parte sequitur," meaning "who prosecutes this suit as well for the king, as for himself." 2 William Blackstone, *Commentaries* 161. As the name implies, a qui tam action is brought by a private individual on the government's behalf. The False Claims Act ("FCA") authorizes the government to bring civil actions

against those who defraud it. Under the FCA, a private citizen, or "relator" in FCA parlance, can bring a qui tam action against a defrauder in the name of the United States. 31 U.S.C. §§ 3729–3733 (1994). The relator files the initial complaint in camera, and it remains under seal for at least 60 days while the government investigates the allegations and decides whether it wants to intervene in the action. *Id.* § 3730(b)(2). If the government decides not to participate in the action, the relator may continue alone on behalf of the government. *Id.* § 3730(b)(1). Pursuant to the 1986 amendments to the FCA, whistleblowers who bring qui tam actions are protected from retaliation by their employers. *Id.* § 3730(h).

Plaintiffs William Garibaldi and Carlos Samuel brought this action against their former employer pursuant to the qui tam provision of the FCA. The United States chose not to intervene, and plaintiffs are pursuing the action alone on behalf of the government. Plaintiff Garibaldi is the Director of the Audit Department of the Orleans Parish School Board ("OPSB"), although he has been suspended. Plaintiff Samuel is a former auditor for OPSB; he has been discharged.

The OPSB has a budget which includes three major funds. The Special Revenue Fund is provided by the Federal Department of Education, and consists of reimbursements for educational grants. The Child Nutritional Fund is subsidized by the Federal Department of Agriculture, and consists of reimbursements for school breakfast, lunch, and summer food programs. The General Fund consists of money from non-federal programs. Plaintiffs' complaint alleges that the School Board management improperly overcharged the two federal programs for more than their share of unemployment insurance and worker's compensation costs in violation of the FCA.

**Unemployment Insurance**

In 1982, OPSB out-sourced the administration of unemployment insurance to an outside contractor by the name of Unemployment Compensation Control Systems, Inc. ("UCCS"). The contract between OPSB and UCCS stipulated that OPSB would be charged rates per payroll dollar for unemployment compensation. OPSB would charge the federal programs and nonfederal programs in accordance with the rates. UCCS set up a three-tiered rate system which allocated insurance costs among the two federal programs budgets and the General Fund. OPSB claims that the rates for the federal programs were higher because the federal unemployment insurance cost more. Records of actual unemployment claims paid, however, indicate that the General Fund had by far the largest number of claims. *See, e.g., Actual Unemployment Claims Paid 1st Qtr. '95 and 2nd Qtr. '95* (Plaintiff Exhibit 12). According to the Board minutes of August 16, 1982, the tiered rate system allowed the School Board to shift the costs of unemployment insurance on externally funded programs to their budgets rather than having these costs "subsidized" by the General Fund. *Minutes of Special Meeting of OPSB*, 8–16–82 at 6 (Defendant Exhibit A). It was estimated at the School Board meeting that the new system would reduce the General Fund costs for the year from over $650,000 to only $329,909, with the Child Nutrition and Special Revenue Fund budgets picking up the slack. *Id.* Defendants contend that an essential reason for the contract with UCCS was UCCS's assurance that the three-tiered system had been approved by the federal government.

In 1984, OPSB renewed the contract with UCCS and contracted for better rates. The board unanimously voted to accept new rates. *Minutes of Orleans Parish School Board* 6–11–84 at 3 (Defendant Ex. 3). The rate for the Federal fund was set at .033; the rate for Food Service was set at .020, and the rate for the General Fund was set at the much lower rate of .0015. *Id.*

OPSB continued to charge using the three-tiered rate system through 1995, except when it briefly recontracted with UCCS in 1994 for a flat rate of .00335. *UCCS Bonded Service Contract* 11/23/94 (Plaintiff Ex. 11). Even when UCCS was being paid out at the flat rate, OPSB continued to use the three-tiered rate internally, and as a result USSC had to present the school board with "revised invoices" in 1995. UCCS revised the invoices so that the three funds would no longer be

billed out at the same flat rate. An addendum to the contract was signed in 1995 which reinstated a three-tiered rate system, setting the rate for the Special Revenue Fund at .021, the Child Nutrition Fund at .013, and the General Fund at .001. *Amendment Number 1,* 9/15/95 (Plaintiff Ex. 11A).

As a result of using the three-tiered system, the federal budgets were charged a much higher percentage of unemployment insurance costs than the general fund. For example, in 1995, the salaries for the fiscal year for the Child Nutrition fund were $9,937,743, and this fund was charged $163,973 in unemployment compensation costs. The salaries for the Special Revenue fund were $25,409,024, and it was billed $686,045. The salaries for the General Fund totaled $215,986,490, but it paid only $269,983 in unemployment compensation costs. *Management's Response to Internal Audit Report* (Plaintiff Ex. 8).

### Workers' Compensation

Beginning in April, 1990, OPSB self-insured for workers' compensation, using the same commercial rates as those of its previous vendor. This saved OPSB money, because by cutting out the middleman but still charging the same rates it achieved a profit. Plaintiffs allege two different improprieties as a result of the self-insurance. First, they claim that OPSB was required by OMB Circular A–87 to have periodic actuarial studies to support its rates, and that it never did so. Second, they claim that OPSB did not properly allocate the surplus which resulted from converting to self-insurance from commercial insurance. For example, in the second quarter of 1990, immediately after switching to the self-insurance plan, the OPSB saved $2,159,241 because of the new plan. Rather than distribute this based on the percentages of payroll and costs that each fund represented, OPSB used the money to give a $1,400,000 discount to the general fund and used the rest to finance zero-interest loans to other funds. According to plaintiffs, OMB Circular A–87 required the school board to gain prior approval by the federal government before making contributions to a reserve for a self-insurance program. *OMB Circular A–87 of 1981,* Sec. C, 4c.

### Garibaldi's Audit Report

In 1994, William Garibaldi was Director of the Internal Audit Department, reporting directly to the Superintendent. Under his direction, the Audit Department began the task of conducting management audits of the various departments, beginning with the Risk Management Department.

In 1995, staff members under Garibaldi's supervision informed Garibaldi that OPSB may have overstated the Federal portion of the unemployment insurance cost in violation of OMB Circular A–87. *See Deposition of William V. Garibaldi III* (2–4–97). OMB Circular A–87 provides that costs, in order to be allowable, must be "necessary and reasonable," be "consistent with policies ... that apply uniformly to both federal assisted and other activities" and be "net of all applicable credits." *OMB Circular A–87 A, Sec. C(1) (a–g)* (Plaintiff Ex. 24). Mr. Samuel informed Mr. Garibaldi that the department of finance was charging to federal programs 96% of the unemployment insurance compensation billed for the fiscal year '94–95 while only four percent was being charged to the general fund of the Orleans Parish School Board. *Deposition of Samuel* at 65 (Defendant Ex. G). Mr. Samuel discovered this by analyzing the general ledger. *Id.* In addition, Mr. Samuel informed Mr. Garibaldi that 90 percent of all employment compensation claims were paid to employees not associated with federal programs but whose salaries and costs of employment were solely attributed to the general fund. *Id.* at 65–66. Mr. Samuel learned this based on audit work done by one of his co-workers, Mr. Marlon Dominick. *Id.* at 66. In response, Garibaldi investigated the data further and prepared an Interim Audit Report on September 1, 1995. The report was sent to the Superintendent of Schools and the head of the Audit Advisory Committee. The CFO, James Henderson, denied the charges and a dispute began between the Finance Department and the Audit Department. Because of the conflict, the Superintendent hired KPMG Peat Marwick to conduct an independent audit. KPMG found no violations of the FCA. Plaintiffs contend, however, that KPMG was not a truly independent auditor because it had au-

dited the OPSB in past years and would have been forced to find its previous audits inaccurate in order to confirm Garibaldi's findings.

### School Board Meeting of December 19, 1995

The school board held a public meeting on December 19, 1995 at which it disclosed the allegations as well as KPMG's conclusion that there were no violations. Superintendent Holmes introduced the issue by explaining that Mr. Garibaldi had come to him and indicated "that too much money was being allocated from this fund as opposed to this fund and that we needed to look at it because possibly that (sic) it was not being done right and that it needed to be studied very carefully." *Minutes of the Orleans Parish School Board Special Meeting* 12–19–95 at 2 (Defendant Ex. D). The representatives of Peat Marwick and the other external auditors announced four "findings" they had reached. An accountant named Mr. Tervalon explained the findings as follows:

> ... just by way of background, Finding # 1 related to Unemployment Compensation Insurance billings, and there were allowability and allocability (sic) under federal circular OMB Circular A87. Finding # 3 related to Workmen's Compensation. Again, it's the charging of the various programs of special revenue funds, Child Nutrition, under the cost principles. Finding # 2 related to the consideration by the Board as to whether or not it is practical to have commercial and unemployment insurance or whether there (sic) should be self-insured. Finding # 4 related to the reporting in accordance with governmental generally accepted accounting principles on those self-insurance funds...
>
> ...we found relative to Findings # 1 and # 3 that the charges to the federal programs for Unemployment Compensation and Workman's Compensation Insur-

ance, that they were in compliance with OMB Circular A87. We further found that there were no violations of the False Claims Act resulting from over charges to federal programs from self-insurance funds. And that while not in violation of OMB Circular A87, we did note that the 1993–1994 premium for Worker's Compensation should be charged to the General Fund. And that charge could be amortized over a period of up to five years.

> With regard to Finding # 2, we concurred with Internal Audit that periodic evaluations of Unemployment Compensation Insurance should be performed, and that the financial analysis of the profitability of the contract with UCCS was not a complete analysis and that possible further review of that could be done.
>
> With regard to Finding # 4, we found that the financial statements included in the Internal Service Funds are properly presented in accordance with governmental guides.

*Id.* at 4.

The gist of the accountants' report was that there were no FCA violations but that the Board needed to tighten up its accounting anyway. There is no indication in the minutes that the specifics of the three-tiered rate structure were revealed at the meeting. The actual requirements of OMB Circular A–87 were never fully explained. *See id.* at 6. The accountant never explained why OPSB's three-tiered rate system did, in their view, comply with the OMB Circular.

### Garibaldi's Suspension and Samuel's Termination

On January 16, 1996, the Superintendent lodged a charge against Garibaldi, claiming that he failed to follow audit procedures and failed to exercise his duty of professional care as Internal Auditor.[1] The Superinten-

---

1. By letter to the Orleans Parish School Board, Superintendent's Holmes charged:

    Acting pursuant to the provisions of Title 17, Section 523 of the Louisiana Revised Statutes of 1950, I hereby charge Mr. Garibaldi, III, Internal Auditor, with wilful neglect of duty. This charge is based upon the following facts:

    ¶ 1. In an interim Audit Report dates September 1, 1995, Mr. Garibaldi proposed certain findings and recommendations about allocating billings to Special Revenue and Food Service Programs.

    ¶ 2. That report proposed a finding that the allocation of certain unemployment compensation insurance billings was "a violation [of] the False Claims Act (18 U.S.C. # 287) and Federal Cost Principles/OMB Circular a–87."

dent's letter makes clear that the suspension was a direct result of the Risk Management audit and quotes Garibaldi's audit report as saying that the unemployment compensation insurance billings were "a violation of the False Claims Act" and of OMB Circular A–87 (*see* footnote 1, ¶ 2, below). Further action to discharge Garibaldi has been enjoined pending this litigation. *See Order and Reasons Granting Plaintiff Garibaldi's Motion for Preliminary Injunction,* 3–12–98 (Civ. No. 94–0464, Doc. # 40). Mr. Samuel has been discharged by the OPSB.

Defendants now move for summary judgment on two theories. First, they allege that this court does not have subject matter jurisdiction under the FCA because the alleged impropriety was public, the plaintiffs were not the original sources of the information, and the firing of the plaintiffs was not in retaliation for filing a qui tam suit. Second, they allege that plaintiffs have failed to provide sufficient evidence of fraudulent intent on the part of the OPSB. Each motion will be addressed in turn.

## ANALYSIS

### I. Standard for Motion for Summary Judgment

Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing this motion, the court views all facts in the light most favorable to the non-movant. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986). If, taken as a whole, the record could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Id.* With this standard in mind, the court now turns to the parties' arguments.

### II. Motion for Summary Judgment for Lack of Subject Matter Jurisdiction:

#### A. Public Disclosure

One of the major changes to the FCA in the 1986 amendments is a jurisdictional bar which prohibits qui tam actions which are "based upon" publicly disclosed material unless the relator is the "original source" of the allegations. In considering whether an action is barred under the public disclosure rule, courts' consider four factors:

¶ 3. The same report also proposed a finding that the "Risk Management Department violated federal cost principles (OMB A–87 and governmental GAAP (GASB 1))," in not billing on an actuarially sound basis.

¶ 4. As Internal Auditor, Mr. Garibaldi is required to conduct and report on investigative audits of system-related activities in accordance with certain audit procedures dates June 11, 1993.

¶ 5. Mr. Garibaldi did not comply with those audit procedures in that:
  A. The September 1 report was not limited to proposed findings of specific facts as required by those audit procedures;
  B. This report contained conclusions of wrong doing as described above in contravention of those audit procedures; and,
  C. He distributed the interim report to staff members and to the Chairman of the Audit Advisory Committee in contravention of those audit procedures.

¶ 6. As Internal Auditor, Mr. Garibaldi also is required to conduct internal audits in accordance with professional standards.

¶ 7. Mr. Garibaldi did not exercise the due professional care required of him as Internal Auditor in the conduct of the audit mentioned above, because:
  A. His report held out as controlling Federal Cost Principles which only had been proposed in 1982, but had not been adopted; and,
  B. His report and supporting work papers had not identified any facts to support the violation of the False Claims Act; that is, the submission of a claim to the federal government, knowing such claim to be false, fictitious and fraudulent.

¶ 8. Mr. Garibaldi released this report to others before the Audited had any opportunity to respond to the findings described in paragraphs 2 and 3 above as well as other findings in that report.

I respectfully recommend that Orleans Parish School Board accept this charge, hold a hearing thereon and at the conclusion of such hearing take such action as it deems proper in the premises. I further recommend that the School Board suspend Mr. Garibaldi with pay pending the final disposition of this charge.
*See* Civ. No. 94–0464, Doc. # 40.

(1) whether the alleged "public disclosure" contains allegations or transactions from one of the sources listed in the FCA;

(2) whether the alleged disclosure has been made sufficiently "public" within the meaning of the FCA;

(3) whether the relator's complaint is "based upon" this "public disclosure"

(4) whether the relator qualifies as an "original source" under § 3730(e)(4)(B).

*United States ex rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 740 (3d Cir. 1997); *United States ex rel. Fine v. MK–Ferguson Co.*, 99 F.3d 1538, 1544 (10th Cir.1996).

OPSB claims that the allegations and transactions of fraud were publicly disclosed on numerous occasions. Specifically, it claims (1) that the three-tiered system was public from its inception, because it was disclosed at school board meetings in 1982 and 1984; (2) that Garibaldi informed the chair of the Audit Advisory Committee of the allegations in July 1995; and (3) that the Superintendent and a Peak Marwick accountant "laid out the allegations and the transactions on which they are based in painstaking detail" at the school board meeting of December 19, 1995.

**1. Does the alleged public disclosure contain allegations or transactions from one of the sources listed in the FCA?**

■ According to the statute, "public disclosure" is defined as the publication of "allegations or transactions":

in a criminal, civil or administrative hearing; in a congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or, from the news media. 31 U.S.C. § 3730(e)(4)(A).

The Fifth Circuit has not expressed a view on whether this list is exhaustive or merely suggestive. However, the prevailing view is that the list is "an exhaustive rendition of the possible sources." *United States ex rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 744 (3d Cir.1997), *citing United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1499–1500 (11th Cir.1991) (holding that the list is specific and not qualified by words that would indicate these are only examples

of types of public disclosure); *see also United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 323 (2d Cir.1992) (stating that the statute furnishes an "exhaustive list" of the ways in which public disclosure must occur for jurisdictional bar to apply); *United States ex rel. LeBlanc v. Raytheon Co., Inc.*, 913 F.2d 17, 20 (1st Cir.1990) (holding that only the "specified" disclosures trigger the bar). In the leading Fifth Circuit case on the issue, the court held that filings in a state civil lawsuit were "public disclosures" within the meaning of the statute. *Federal Recovery Services, Inc. v. U.S.*, 72 F.3d 447, 450 (5th Cir.1995). In so holding, the court did not claim to be reaching beyond the language of the statute. The Fourth Circuit case it relied on held that the reason filings in civil cases are "public disclosures" is that they constitute part of a "civil hearing" within the meaning of the statute. *U.S. ex rel Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1350 (4th Cir.1994), *cert. denied*, 513 U.S. 928, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994). To be "public disclosures," then, the allegations and transactions alleged by Garibaldi and Samuel must have been disclosed to one of the sources enumerated in the statute.

■ A close reading of the statute shows that the sources are loosely grouped into three different types. The first type, "a criminal, civil or administrative hearing," appears to mean any civil, criminal, or administrative hearing, state or federal. As discussed above, the Fifth Circuit has construed the meaning of "civil hearing" to included publicly filed documents in a civil trial. *Federal Recovery Services, supra.* The Fifth Circuit has not enunciated the boundaries of an "administrative hearing"; however, this court understands a "hearing" to be an adversarial process which allows for the introduction of evidence and full exploration of issues. *See Black's Law Dictionary, 6th Del. Ed.* at 721. The court has not found any authority, nor has any been provided, holding that a school board meeting is an "administrative hearing" for purposes of establishing a public disclosure as defined in the FCA. The school board meeting of December 19, 1995, at which the allegations brought by Garibaldi and Samuel were disclosed, was not

an "administrative hearing" within the meaning of the statute. This meeting possessed none of the safeguards of due process inherent in a civil trial, tenure hearing, or other adversarial proceeding. Mr. Garibaldi and Mr. Samuel were not represented at the meeting. Their viewpoints were not presented in a sympathetic light. The purpose of the meeting was to tell the school board that an FCA violation had been alleged but that Peak Marwick KPMG had assured OPSB that the allegations were false. This one-sided presentation of the allegations, which did not begin to disclose their true nature and breadth, was clearly not an "administrative hearing" within the meaning of the statute. Similarly, the 1982 and 1984 school board meetings were not administrative "hearings."

The second group of sources listed in the statute are federal in origin. The statute defines "public disclosure" as allegations or transactions "in a congressional, administrative, or General Accounting Office report, hearing, audit, or investigation." Courts have consistently held that the punctuation, which places the sources in this list together in one clause, coupled with the order of the words, indicates that this list refers exclusively to federal sources of information. For example, the *Dunleavy* court held that "administrative reports" refers only "to those administrative reports that originate with the federal government," explaining:

> We find it hard to believe that the drafters of this provision intended the word 'administrative' to refer to both state and federal reports when it lies sandwiched between modifiers which are unquestionably federal in character ... If state and local government reports were treated as

administrative reports under the Act, the jurisdictional bar might be invoked through information submitted by those bent on convincing a federal agency that no fraud, in fact, was occurring.

The audit reports written by Garibaldi were clearly not "administrative" reports or audits within the meaning of the statute. These were not audit reports written for the federal government, but for the local school district.

■ The third and final source of public disclosure in the statutory list is "from the news media." That the news media attended an event is not enough; the express words of the statute require that the actual allegations or transactions were obtainable "from the news media." § 3730(e)(4)(A). Here, news media attended the event. However, OPSB has produced no evidence that the federal government, the relators themselves, or anyone else obtained the information through the news media, and the public disclosure requirement is therefore not met.[2]

## 2. Were Garibaldi and Samuel "original sources" of the information?

■ Because the court finds that the allegations and transactions of this qui tam action were never publicly disclosed within the meaning of the statute, it need not consider whether Garibaldi and Samuel were original sources of the allegations. However, it is clear to the court that even if we were to stretch the meaning of "administrative hearing" to include school board meetings, OPSB's summary judgment motion would still fail because the relators are original sources of the information.

Even in cases where a qui tam action is based on public disclosures as defined in the

2. As noted in the summary on page 11, there are four prongs to the "public disclosure" analysis. Even if the information had been disclosed to a source within the statutory scheme, such as a civil trial or congressional report, the public disclosure bar would not apply unless the disclosure was sufficient so that the true nature and breadth of the allegations were sufficiently aired (the second prong), and the qui tam suit was "based on" the public disclosure (the third prong). The Fifth Circuit has not spoken clearly on either of these issues. The remaining circuits are in disagreement and the law is murky. *See, e.g., United States ex. rel. Dunleavy v. County of Delaware,*

123 F.3d 734, 740–44 (3d Cir.1997); *United States ex rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d 645, 654 (D.C.Cir.1994); *Wang v. FMC Corporation,* 975 F.2d 1412, 1418 (9th Cir. 1992). Furthermore, the required inquiries are factually intensive and cumbersome. Because this court finds so clearly that the disclosures in question are not the ones required by the statute, and because the court further finds that even if there were public disclosures, Garibaldi and Samuel were original sources of the disclosures, we need not venture into unchartered territory on the issues of sufficient disclosure and whether the action is "based upon" them.

statute, the jurisdictional bar does not operate if the relator is "an original source" of the public disclosure. The public disclosure jurisdictional bar prevents parties from bringing opportunistic qui tam actions when they are not true whistleblowers. True whistleblowers, however, are encouraged to bring qui tam actions under the statute. As one circuit court explained, "[t]he Act rewards those brave enough to speak in the face of a conspiracy of silence." *Wang v. FMC Corporation*, 975 F.2d 1412, 1419 (9th Cir.1992). Under the FCA, a relator is a true whistleblower if he or she is "an original source" of the public disclosure.

■ The False Claims Act defines an original source as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). "In order to be 'direct,' the information must be firsthand knowledge. In order to be 'independent,' the information known by the relator cannot depend or rely on the public disclosures." *United States ex. rel. Findley*, 105 F.3d 675, 690 (D.C.Cir.1997).

There is no question here that Garibaldi and Samuel's disclosures were "independent" as required by the statute. Even if we were to assume that the school board meeting was a public disclosure, the meeting was held precisely because of the information brought forth by Garibaldi and Samuel. As discussed above, the audit reports were clearly not public disclosures within the statute, but even still, they were prepared by Garibaldi. The only information Garibaldi based his allegations on were the financial records of the OPSB. The bare records were not public disclosures of fraud.

The question of whether Garibaldi and Samuel had "direct" knowledge is more complex. There has been some dissention among the circuits as to what the precise requirements for "direct" knowledge are. In a case which at first glance appears similar to the one at bar, the Tenth Circuit held that a director of an audit department was not an original source because his knowledge was "secondhand and derivative of the information generated by the auditors who actually performed the audit and uncovered the facts." *United States ex rel. Fine v. Advanced Sciences, Inc.*, 99 F.3d 1000, 1007 (10th Cir.1996). In that case, however, Fine had no hand in the audit department's conclusion that the transactions were fraudulent. Here, Garibaldi was instrumental in creating the audit report which revealed the allegations. Samuel was one of the auditors who actually uncovered the alleged fraud.[3] Garibaldi and Samuel are exactly the kind of sources anticipated by the statute's "original source" exception.

The purpose behind limiting qui tam lawsuits to those who had "direct and independent knowledge" of the fraud is to "prevent 'parasitic' qui tam actions in which relators, rather than bringing to light independently discovered information of fraud, simply feed off of previous disclosures of government fraud." *United States ex rel. McKenzie v. Bellsouth Telecommunications*, 123 F.3d 935, 943 (6th Cir.1997). Garibaldi and Samuel are anything but parasites. They did not base their allegations on previously disclosed public allegations. Samuel and other auditors discovered what they believed to be a violation of the False Claims Act, and Garibaldi and Samuel investigated it further. Garibaldi and Samuel were the moving force behind the December 19, 1998 School Board meeting and the Peat Marwick audit of the OPSB. They are exactly the kind of plaintiff-relators anticipated by the statute. As the Eleventh Circuit explained, citing one of the senators who sponsored the 1986 amendments to the FCA: "...a party with knowledge of fraud against the government should be able to maintain a qui tam action as long as he had some of the information in advance of the public disclosure." *Cooper v. Blue Cross and Blue Shield of Florida*, 19 F.3d 562, 568 (11th Cir.1994), citing Sen. Grassley, 101st Cong.2d Sess. 3 (1990).

3. The argument that Samuel cannot be an original source because got his information from a ledger has no merit. Were this the case, an actual living person would almost never be an original source, and qui tam actions would have to be filed by the books and ledgers themselves.

The FCA states nowhere that *"an* original source" means *"the only* original source." Fraud on the government can be diffuse and institutional. It will not always be discovered by one person. Often, several employees together may each contribute a piece of the mosaic. If one of the employees does not come forward to report the fraud, this does not preclude a qui tam suit. Indeed, such a regime would make qui tam suits well neigh impossible to bring. Here, Garibaldi and Samuel were the first and only employees to report the fraud to the Superintendent. They were each at the very least partial sources of the information, as they developed it and prepared the final report for OPSB. As such, they were "original sources."

### B. Retaliation

The whistleblower provision of the False Claims Act encourages employees with knowledge of fraud to come forward by prohibiting retaliation against employees who assist in bring qui tam actions against their employers. *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir.1994). The statute provides:

> Any employee who is discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against in the terms and conditions of his employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole . . . .

31 U.S.C. § 3730(h). Accordingly, to prove his claim for retaliation, an employee must show that (1) he took acts in furtherance of a qui tam suit, (2) his employer knew of these acts, and (3) his employer "retaliated against him" because of these acts. *Zahodnick v. Int'l Business Machines* Corp., 133 F.3d 920, 1997 WL 782936 (4th Cir.1997); *cf., Robertson*, 32 F.3d at 951 (citing legislative history, "whistleblower must show the employer had knowledge the employee engaged in protected activity"). In determining whether an em-

ployee engaged in protected activity, courts consider the whistleblower's employment and the nature of the conduct. In *Robertson*, the Fifth Circuit concluded that the plaintiff had not engaged in protected activity by repeatedly voicing his concerns about possible overcharging of the federal government, because he never used the terms "illegal," "unlawful" or "qui tam action" in characterizing his concerns about the charges. *Id.* The court further concluded that the plaintiff's employer did not know that his activities were in furtherance of a qui tam action since his investigative activities fell within his job duties. *Id.; see U.S. ex. rel. McKenzie v. Bellsouth Tel.*, 123 F.3d 935, 944 (6th Cir. 1997). That an employee's investigative activities coincide with his job duties, however, does not appear to be fatal; indeed, such a reading of *Robertson* would curtail the usefulness the retaliation provision and might discourage employees to come forward with information about employer fraud. Rather, *Robertson* appears to require proof that the employer knew that the employee acted in furtherance of a qui tam action. *Id.,citing Mikes v. Strauss*, 889 F.Supp. 746 (S.D.N.Y. 1995) (interpreting *Robertson* to require proof that employer had reason to believe that the employee was contemplating a qui tam action.).

The court finds that Garibaldi has established a prima facie showing as to all three elements of his retaliation claim. First, Garibaldi engaged in protected activity under the act by (1) mentioning possible violations of the False Claims Act in his Interim Audit Report, and (2) filing this qui tam suit. *See Robertson*, 32 F.3d at 951. Garibaldi's concerns about False Claim Act violations were set forth as proposed findings in his Interim Audit Report and the Superintendent's charge is based on that report and Garibaldi's conduct in connection with disclosing his proposed findings. By the time that the School Board presented its charges against Garibaldi in May 1997, this qui tam action had been pending for over one year. The unsealing, service and answering of the complaint eliminated any ambiguity as to Garibaldi's cooperation, initiation, and investigation of this action. The fact that the investigation of alleged over

charging may fall squarely within the scope of Garibaldi's job description is not problematic here. Unlike in *Robertson,* Garibaldi flagged his concerns as potential False Claims Act violations and thereby identified himself early on as a putative qui tam plaintiff; the Superintendent's charge contains these facts. By November 1997, all three elements to Garibaldi's retaliation claim were extant: (1) Garibaldi engaged in protected activity by filing a qui tam lawsuit, (2) the School Board knew about those activities, and (3) the School Board suspended Garibaldi and threatened to terminate him for his activities because of the protected activity, which allegedly violated School Board policy. The court finds that Garibaldi has demonstrated a prima facie case for retaliation under the False Claims Act.

### III. Motion for Summary Judgment for Lack of Evidence of Fraudulent Intent

Plaintiffs have alleged that defendants had several duties in reporting claims to the federal government which they neglected to perform. First, OPSB was required by OMB Circular A–87 to charge the federal government in a "necessary and reasonable" way, and to apply its methods "uniformly to both federal assisted and other activities." Plaintiffs contend that defendant's use of the three-tiered rate system was unsupported by any factual data and was therefore not "necessary and reasonable." Charging a budget which makes up 10% of the total payroll for 96% of the unemployment interest, plaintiffs contend, is not applying a cost allocation method "uniformly to both federal assisted and other activities." Second, plaintiffs point out that OMB Circular A–87 requires that costs must be "net of all applicable credits." *OMB Circular A–87 A, Sec. C(1)(a–g)* (plaintiff ex. 24); *see also Compliance Supplement for Single Audits, OMB revised 1990* (Plaintiff Ex. 25). OPSB charged the federal gov-

ernment for workers' compensation before adding in the credit it saved by self-insuring; thus, the costs were not allowable because they were not made net of all applicable credits. Third, plaintiffs contend that the workers' compensation self-insurance plan required federal approval before claims could even be made, and that such federal approval was never even sought. *OMB Circular A–87 of 1981,* Sec. C, 4c; 34 C.F.R. 80 (Education Department); 7 C.F.R. 3015.191 (Department of Agriculture). Fourth, plaintiffs contend that the Compliance Supplement requires that direct billed services such as the two insurance funds at issue here be supported by "independent actuarial studies ... [that] are performed and kept current." *Compliance Supplement for Single Audits, OMB revised 1990, Sec. 2–8* (Plaintiff Ex. 25).

■ Assuming for the sole purpose of deciding this motion that all these allegations are true, the court must still find for defendants unless it finds that there are genuine issues of material fact as to whether OPSB committed these acts with the requisite level of scienter under the FCA.[4] The Fifth Circuit has elucidated clearly the distinction between using the FCA as an "enforcement vehicle" for other statutes and using the FCA to deter against fraud. For example, in *U.S. ex rel. Thompson v. Columbia,* 125 F.3d 899 (5th Cir.1997), the relator alleged that the defendants violated the FCA by submitting Medicare claims for services rendered in violation of the Medicare anti-kickback statute and the Stark laws.[5] Summary judgment was upheld for the defendants, because the FCA is not an enforcement vehicle for the Stark laws. Instead, the FCA is designed to remedy actual false or fraudulent claims made with the requisite level of knowledge. *Id.* at 902–03. Merely submitting a false claim does not show the necessary scienter for fraud. *Id. See also U.S. v. Weinberger,* 527 F.2d 456 (5th Cir.1977) (mere submission

---

4. The actual truth or falsity of the allegations is a question of fact for the trier of fact to determine. The Audit Department, Finance Department, and the Peat Marwick auditors disagreed as to whether the claims in question violated OMB Circular A–87. This shows that at the very least there are questions of material fact as to whether a violation even occurred.

5. 42 U.S.C. § 1320a–7b (Medicare & anti-kickback statute); 42 U.S.C. § 1395nn (self-referral statute), commonly known as the "Stark" laws after the statute's congressional sponsor, U.S. Representative Fortney H. "Pete" Stark.

of claims that overcharge the government in violation of the Anti–Pinkerton Act not a violation of the FCA; FCA violation requires "material misrepresentation to gain government privilege"); *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir.1997) (violations of regulations made without scienter not remediable under FCA).

■■■■■ The requisite level of scienter is clearly outlined in the FCA itself. For a false claim to be actionable under the FCA, it must have been made "knowingly." 31 U.S.C. 3729(B). The FCA defines "knowing" and "knowingly" to mean:

> that a person with respect to information—(1) has actual knowledge of the information (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard for the truth and falsity of the information, and no proof of specific intent to defraud is required. *Id.*

This scienter requirement is something less than that set out in the common law. *Wang v. FMC Corp.*, 975 F.2d 1412, 1420 (9th Cir. 1992). Unlike at common law, where there need be an actual, conscious "trick, deceit, chicane or over reaching," under the FCA even "reckless disregard" for truth is sufficient to infer fraud. *Id.* Since a corporation or local government body has a duty to be aware of the amount and nature of its claims to the federal government and to certify that these claims are reasonable, recklessly disregarding this duty could meet the scienter requirement of the FCA. The question before the court today is the sufficiency of the evidence suggesting that OPSB's lack of action reached the level of "reckless disregard."

■■■■■ OPSB had the requisite scienter if (1) it knew it was required to use reasonable, uniform rates for federal unemployment insurance and failed to do so; (2) it knew it was required to gain federal approval before self-insuring worker's compensation and failed to do so; (3) it knew it had to allocate moneys *net* of all applicable credits and yet allocated worker's compensation costs before crediting the savings from self-insurance solely to the General Fund; and/or (4) it

knew it was required to conduct actuarial studies but did not.

■■■■■ That it was UCCS and not OPSB who set the rates is no defense for OPSB. The school board knew what the rates were (board members voted on the rates as early as 1984). If it also knew that it had an obligation to set reasonable, uniform rates, the mere fact that the rates were the brainchild of an external consultant *does* not absolve OPSB of liability. OPSB has stated that a primary factor in the choice to use UCCS was that the federal programs cost more then the programs administered under the general fund, and that they wanted to assess those programs at "an appropriate rate consistent with their cost." *Letter from Jack Steward, Insurance Administrator for OPSB, to Dr. Gupta, Asst. Superintendent for Business and Finance,* 6–30–82 (*cited in Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment for Lack of Evidence of Fraudulent Intent* at 9). Even if this initial interaction with UCCS was motivated solely by a desire to allocate costs fairly between the two funds, by 1984, when OPSB and UCCS contracted for better rates, the rates were wildly convergent. At this point, the federal rate was set at .033 and the General Fund rate was set at .0015.[6] These rates were voted upon by the members of the school board. A reasonable inference can be drawn that the school board should have suspected that such a tremendous disparity in rates was not "reasonable," especially when it was obligated by federal regulation to provide a rationale for its rates.

Other suggestions that OPSB had knowledge of and control over the rates are present throughout the record. For example, in late 1995, UCCS had to provide at the request of the school board "revised invoices" in because it originally billed the defendant on an .003355 rate for all programs and then realized its "mistake." The "mistake" occurred because UCCS, pursuant to its revised 1994 contract with OPSB, was being billed at the .003355 rate, but OPSB, without UCCS's knowledge, was still charging a 3–

---

6. To illustrate the disparity between the rates, note that a rate of .033 applied to a sum of $100,000 is $3,300; while a rate of .0015 applied to $100,000 is only $150.

**620**

tiered rate to the programs. In September of 1995, the official contract was revised so that the rates were once again markedly different, with the Special Revenue charged at a rate of .021 and the General Fund at a rate of .001. The renegotiating of the contract and revising of the invoices to negate the effects of the flat-rate contract show that OPSB knew that the three-tiered system was overwhelmingly favorable to its budget. A reasonable inference could be drawn that the revised invoices from UCCS show that UCCS was not solely responsible for the thought that went into setting the rates, and that OPSB knew full well the effect of the rates and had control over them.

Further illustrating OPSB's knowledge and control is the OPSB Management's response to Garibaldi's first audit report. Upon reading Garibaldi's report, OPSB reduced the billing on the federal programs, but not enough to make it commensurate with the billing to the General Fund. Instead of charging the federal programs for 96% of the costs of unemployment insurance, OPSB was now charging them for 74%. OPSB seems to have recognized that Garibaldi had identified a problem, but, once again, provided no rationale for the solution and continued charging the funds at extremely disparate rates. A trier of fact could find that, taken as a whole, OPSB's actions from 1984 until 1995 indicate that OPSB was either purposely abrogating its responsibility to provide some sort of rationale to support its rates, or that it recklessly disregarded its duty to do so.

The alleged fraud involved in the worker's compensation self-insurance also provides questions of material fact for the jury. OPSB does not deny that it moved to a self-insurance system in 1990 and that this saved the General Fund a considerable amount of money. The question is whether OPSB knew that having such a self-insurance system without the federal government's approval was a violation of OMB Circular A–87 or that the surplus needed to be allocated proportionately across all the funds. Once again, a reasonable inference could be drawn that OPSB should have known that the federal funds should not have been bearing 50% of the costs of worker's compensation when they did not comprise even close to that percentage of the payroll.

Only by trying this case on its merits, by scrutinizing the credibility of witnesses and listening to their answers to counsels' questions about their thoughts and motivations can a trier of fact determine whether the appropriate level of scienter was present. As of yet, defendants have produced no compelling justification for the great disparity of rates charged through UCCS and to worker's compensation. Perhaps at trial it will. The trier of fact must decide just how facially skewed the UCCS-recommended rates needed to be before OPSB should have required an explanation. A public body cannot blindly follow the recommendations of an external consultant if the rates charged are patently unreasonable. Only the jury can decide whether the rates were unreasonable, and whether OPSB knew or recklessly disregarded the unreasonableness of the rates. At this juncture, the court holds that enough evidence has been produced by the plaintiffs that a reasonable trier of fact could so infer.

Accordingly,

**IT IS ORDERED** that the Motions for Summary Judgment filed by Orleans Parish School Board are **DENIED.**