# Illinois Official Reports

## Appellate Court

---

*State ex rel. Schad, Diamond & Shedden, P.C. v. National Business Furniture, LLC*,
2016 IL App (1st) 150526

---

Appellate Court
Caption

THE STATE OF ILLINOIS *ex rel.* SCHAD, DIAMOND AND SHEDDEN, P.C., Relator-Appellant, v. NATIONAL BUSINESS FURNITURE, LLC, Defendant-Appellee.

District & No.

First District, First Division
Docket No. 1-15-0526

Filed

August 1, 2016

Decision Under
Review

Appeal from the Circuit Court of Cook County, No. 12-L-84; the Hon. Thomas R. Mulroy, Judge, presiding.

Judgment

Affirmed.

Counsel on
Appeal

Stephen B. Diamond, P.C. (Stephen B. Diamond, Matthew S. Burns, and David Kim, of counsel), and Vanasco, Genelly & Miller (David A. Genelly, of counsel), both of Chicago, for appellant.

Swanson, Martin & Bell, LLP, of Chicago (Ronald L. Wisniewski, of counsel), and Brann & Isaacson, of Lewiston, Maine (Peter J. Brann and David Swetnam-Burland, of counsel), for appellee.

Panel

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Cunningham and Justice Connors concurred in the judgment and opinion.

**OPINION**

¶ 1     This is a *qui tam* action brought on behalf of the State of Illinois by relator, the law firm Schad, Diamond & Shedden, P.C., against defendant National Business Furniture, LLC, a retailer of business furniture and office supplies. Relator alleged that, from January 2006 through August 2014, defendant knowingly failed to collect and remit use tax on shipping charges for Internet and catalog sales it made to Illinois residents, a so-called "reverse false claim" for which relator contended defendant was liable for treble damages and penalties under the Illinois False Claims Act (740 ILCS 175/1 *et seq.* (West 2010)). Following a two-day bench trial, the circuit court entered judgment in defendant's favor, finding relator failed to prove that defendant knowingly concealed or avoided an established duty to pay to the State. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 2                                   BACKGROUND

¶ 3     To put relator's claims in context, a brief overview is needed of both the law governing the collection of use tax in Illinois and the way defendant sells and ships its products.

¶ 4     Pursuant to the Use Tax Act, "[a] tax is imposed upon the privilege of using in [Illinois] tangible personal property purchased at retail from a retailer." 35 ILCS 105/3 (West 2014). Retailers have a duty to collect the tax from their customers and remit it to the State. 35 ILCS 105/3-45 (West 2014). Use tax is computed as a percentage of the selling price of the merchandise—currently 6.25%. 35 ILCS 105/3-10 (West 2014). At all relevant times, section 130.415 of the Administrative Code provided that the determination of whether use tax must be collected on shipping charges "depends not upon the separate billing of such *** charges or expense, but upon whether [they] are included in the selling price of the property." 86 Ill. Adm. Code 130.415(b) (eff. Oct. 2, 2000). That is, if shipping charges are separately contracted for, they are not considered part of the selling price and are not taxed. *Id.* Although "[t]he best evidence that transportation or delivery charges were agreed to separately and apart from the selling price[ ] is a separate and distinct contract for transportation or delivery[,] *** documentation which demonstrates that the purchaser had the option of [either] taking delivery of the property, at the seller's location, for the agreed purchase price, or having delivery made by the seller for the agreed purchase price plus an ascertained or ascertainable delivery charge will suffice." 86 Ill. Adm. Code 130.415(d) (eff. Oct. 2, 2000).

¶ 5     The Illinois Department of Revenue (IDOR) has issued a number of general information letters which, although they are not binding statements of department policy, provide further guidance to retailers regarding when use tax must be collected. These letters state that "[m]erely listing the [shipping] charges separately on an invoice without more evidence is insufficient" to establish that such charges were separately contracted for.[1] Because the determination is fact-specific, the IDOR sometimes states in its letters that a conclusion regarding a particular retailer's tax liability cannot be reached without additional information

---

[1]Illinois Department of Revenue General Information Letter No. ST 03-0103-GIL (July 10, 2003).

regarding how transactions are processed and what delivery options are available to the retailer's customers.[2]

¶ 6　　Our supreme court further clarified the law governing the taxation of shipping charges in *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351 (2009). The plaintiffs in *Kean* alleged, *inter alia*, that an online retailer improperly collected Illinois use tax on shipping charges in connection with purchases made from its website. *Id.* at 354. The appellate court affirmed the circuit court's dismissal of the plaintiff's complaint for failure to state a claim and the supreme court agreed. *Id.* at 377. It concluded that "no separate agreement for transportation arose" where, even though several different options were available to them, "plaintiffs could not submit their internet orders unless and until they selected a shipping option"; nor could they make purchases on the defendant's website and then pick up the merchandise at one of the defendant's brick and mortar stores. *Id.* at 367-69. Because a transaction could only be completed by paying the defendant for shipping, the supreme court concluded that the shipping charges were "inseparable" from the sale and therefore taxable. *Id.* at 369, 376. Notably, the court in *Kean* declined to consider several hypothetical scenarios, including whether shipping charges would be taxable if a customer purchased items from the defendant's website and separately arranged for them to be shipped by a third-party carrier. *Id.* at 376.[3]

¶ 7　　We turn now to the details of defendant's business model. Defendant is a Wisconsin-based company that sells office furniture and supplies to customers throughout the country through any combination of four channels: in-person visits from sales representatives, catalog orders, a toll-free telephone line, and defendant's website. Defendant has no retail locations or warehouses in Illinois, but instead operates on a drop-shipment model; it forwards orders to third-party manufacturers it has contracts with, who then ship merchandise directly to defendant's customers. Except in rare situations where a customer orders from a local manufacturer and elects to pick up the merchandise at the manufacturer's warehouse, the items defendant sells must be delivered to its customers.

¶ 8　　Defendant does not have separate written contracts regarding delivery. Its customers typically select the type of delivery they would like and pay defendant a shipping charge that is indicated on their invoice or order confirmation. Website customers are told that a "delivery charge will be calculated at checkout. *** This product ships via UPS or FedEx and will be brought inside your building," and are provided with a toll-free telephone number to call if they "require additional services." A separately itemized shipping charge then automatically

---

[2]See, *e.g.*, Illinois Department of Revenue General Information Letter No. ST 09-0100-GIL (July 31, 2009) ("We cannot tell from the information that you have provided whether the transportation charges (freight) have been separately contracted for or not under the guidelines of Section 130.415.").

[3]Prompted by the supreme court's decision in *Kean*, amendments to section 130.415 that went into effect on April 1, 2016, now provide a number of additional illustrations clarifying when an "inseparable link" exists between shipping charges and the selling price of merchandise. 86 Ill. Adm. Code 130.415(b)(1)(B), amended at 40 Ill. Reg. 6130, 6143 (eff. Apr. 1, 2016). The amendments also establish a safe harbor period between November 19, 2009, and the effective date, during which time a business is considered compliant if it computed its tax liability under either the old or the new rule. *Id.* Because, as discussed *infra*, the circuit court did not reach the underlying issue of whether defendant had a duty to collect use tax on shipping charges in Illinois, but instead concluded that defendant lacked the requisite state of mind for a False Claims Act violation—and because we affirm on that basis—the recent amendments to section 130.415 have no bearing on our analysis.

appears when the customer proceeds to the "shopping cart" page. Defendant's catalog similarly indicates that the "ADVERTISED PRICE DOES NOT INCLUDE DELIVERY CHARGES" and "[s]hipping and handling charges will be applied." It instructs customers to call defendant for an "exact charge" for shipping to include on the catalog order form.

¶ 9    The "frequently asked questions" section of defendant's website explains that there are several options for delivery, with smaller items generally delivered by UPS and larger items like furniture either delivered to the inside of the customer's place of business or retrieved by the customer from the back of the delivery truck. Customers are again encouraged to call defendant for more information about their shipping options. Although not mentioned on defendant's website or catalog order form, customers who call may alternatively arrange for delivery using their own accounts with third-party shipping companies. Those who select this "freight collect" option are charged nothing for shipping and handling by defendant. According to defendant's records, this delivery method was selected in connection with approximately 20 to25 orders, out of thousands of purchases made by Illinois residents during the relevant time period.

¶ 10    In Illinois, it has been defendant's practice at all relevant times to collect and remit use tax on merchandise totals but not on shipping charges, a practice which is clearly reflected on its invoices and order confirmations. Exceptions to this policy include sales to tax-exempt purchasers like government entities, for which no use tax is collected at all, and rare cases where use tax is collected on the bundled total because the shipping charge is not separately stated, *i.e.*, where a customer requests a bundled price for its own internal purposes, or where a vendor includes free shipping in the price of its goods.

¶ 11    In its complaint filed on January 4, 2012,[4] relator alleged that, contrary to this policy, defendant had a clear duty to collect use tax on shipping charges in Illinois. Relator further alleged that, prior to July 27, 2010, defendant "knowingly made, used or caused to be made or used [ ] false record[s] or statement[s] to conceal, avoid or decrease [this] obligation to pay or transmit money or property to the State." Specifically, relator alleged that defendant's order confirmation pages, order and shipment confirmation e-mails, invoices, accounting records, and the monthly ST-1 tax returns it filed with the IDOR "falsely omit[ted] tax on shipping and handling charges due on its Internet and Catalog sales." As to defendant's actions after July 27, 2010, when amendments to the False Claims Act eliminated the requirement of a false record or statement (compare 740 ILCS 175/3(a)(7) (West 2008), with 740 ILCS 175/3(a)(1)(G) (West 2010)), relator simply alleged that defendant "knowingly concealed or knowingly and improperly avoided or decreased" its obligation to collect and remit use tax on shipping charges. On February 6, 2014, relator amended its complaint to add allegations of defendant's continued failure to collect use tax on shipping charges during the two years that the case had been pending. Relator sought damages equal to three times the amount of unpaid taxes, statutory penalties for each failure to file an accurate monthly ST-1 tax return, and expenses, costs, and attorney fees. See 740 ILCS 175/3(a)(1), (a)(2) (West 2010).

¶ 12    A two-day bench trial was held on August 28 and 29, 2014. The circuit court heard testimony from the three individuals—Daniel Paruzynski, Eileen Baus, and Perry Amadon—who served as defendant's chief financial officers during the relevant time period and, by virtue of that office, had primary responsibility for the company's collection and

---

[4]The State declined to intervene on February 24, 2012.

remittance of state use taxes. In addition to explaining defendant's business model and the shipping options available to its customers, these witnesses were questioned regarding when and how the company implemented its use tax policy in Illinois and what mechanisms it has for complying with state and municipal tax laws in the various jurisdictions in which it sells merchandise.

¶ 13    Daniel Paruzynski, a certified public accountant, was hired as defendant's chief financial officer in 1999, a position he held until he left the company in February 2008. He testified that defendant collected use tax on merchandise sold in approximately 20 states and on shipping charges in approximately 15 of those states. When asked why the company made this distinction, Paruzynski stated: "Because based on our interpretation of the rules, we conclude[d] that freight and handling is taxable in those states. And the few states that [defendant] does not collect and remit, it's because the conclusion is it's not taxable in those states." Paruzynski explained that, when the company became subject to use taxes within a jurisdiction, he and his staff would conduct research and "maybe" consult with an accounting or a law firm regarding the company's tax obligations. According to Paruzynski, defendant subscribed to a tax alert to inform it of changes to the rates and rules adopted by the various states, and employed lawyers and accountants with whom defendant met regularly to advise it on state tax issues.

¶ 14    Although defendant began to have a sales presence in Illinois around the time he started with the company, thus making it subject to Illinois use tax requirements, Paruzynski was not sure if the decision to tax merchandise but not shipping charges was made before or during his tenure. He admitted, however, that the policy was not revisited when defendant was later acquired by a German company and had to re-register with the State. Paruzynski "assum[ed]" the company's initial conclusion that it had no duty to tax shipping charges in Illinois was "probably" based on its interpretation of section 130.415. Although he was sure that he had reviewed the regulation prior to the weeks leading up to trial, he could not recall specifically when he did so. He furthermore did not recall ever reviewing any case law or general information letters issued by the IDOR. When asked what conclusions he drew from section 130.415, Paruzynski stated: "The conclusions were that based on how we negotiated freight with the customer, that [shipping costs] would have been not taxable." Paruzynski additionally testified that, during his employment, the accounting firm Deloitte and Touche filed tax returns on defendant's behalf in all states where it was required to do so, and never indicated to defendant that it should tax shipping charges for merchandise delivered in Illinois. He admitted, however, that he could not recall having any specific conversations with the accountants regarding the issue. Paruzynski testified that he never received any indication that the law regarding the taxation of shipping charges in Illinois had changed. If he had, the company would have revisited its policy.

¶ 15    Eileen Baus began working for defendant in 1996 and served as the company's controller from 2003 to 2008 and its chief financial officer from February 2008, when she took over for Paruzynski, until September 2012. Baus testified that Illinois is one of 20 states and, including municipalities, hundreds of taxing jurisdictions in which defendant sells merchandise, and that the company subscribes to a publication that announces changes in state laws governing sales and use taxes. Although she could not recall where she learned it, Baus has always believed that a shipping charge was not taxable if it was separately itemized on an invoice. She did not recall ever reviewing statutes or regulations or talking to defendant's accountants or lawyers

about Illinois use tax. She was also not aware of the *Kean* decision until after the filing of this lawsuit. Although she relied on those who reported to her to review relevant state court decisions, she admitted that the company had no specific procedure in place for those individuals to follow. Baus confirmed that she was involved in the purchase and installation of new tax software in 2010 and testified that no new review of state tax laws and regulations was undertaken at that time. Instead, tax codes for each state were simply programmed into the software based on the company's existing practices. Baus additionally confirmed that the company made no changes to its policy relating to the collection and remittance of Illinois use tax following the filing of this lawsuit.

¶ 16 Perry Amadon testified that he took over as defendant's chief financial officer in 2012. When this lawsuit was first filed, he read section 130.415 and "skimmed" the supreme court's decision in *Kean*, but reviewed no other case law. He stated that it was his decision to maintain the *status quo* and continue to not collect use tax on shipping charges in Illinois. Although he agreed that the law "could be interpreted different ways," Amadon testified that he "never saw anything that clearly state[d] that [defendant] should have been collecting sales and use tax on shipping charges." The circuit court judge made a point of asking Amadon why he did not consult with a tax professional:

> "THE COURT: Someone as careful as you are would when confronted with an interpretation of regulation normally reach out to an expert tax lawyer or an expert outside accounting firm and you didn't and I'm wondering why.
> THE WITNESS: I can't tell you why I didn't do that."

¶ 17 Evidence was also presented at trial concerning the IDOR's audit of defendant's business in late 2007 and early 2008. This evidence includes a letter received by defendant from the IDOR on December 19, 2007, announcing that an "Illinois Sales and Use Tax audit" would be conducted for the period of January 1, 2006 to June 30, 2007. The IDOR requested access to defendant's ST-1 sales and use tax returns, Excel data files for Illinois destination sales, exemption certificates, and information regarding the company's own purchases in Illinois. The letter informed defendant that "[a]s part of the audit process, [the auditor would] perform compliance reviews for all other Illinois taxes administered by the [IDOR]" and that "[a]ny additional information required as a result of the review of the above information [would] be requested as the audit progresse[d]."

¶ 18 Paruzynski testified that, over his career, he had participated in approximately 20 state tax audits, including seven or eight that occurred while he served as defendant's chief financial officer. During the IDOR audit at issue here, Paruzynski and his staff interacted with the auditor on a day-to-day basis. It was Paruzynski's understanding that the auditor would look at the company's sales tax returns and compare them to company records, verify exemption certificates for transactions involving tax-exempt purchasers, and review documentation for purchases made by the company's Illinois sales representatives. Although the focus of the audit was not on the collection of use taxes on shipping charges, it was understood that the auditor would have access to all of defendant's files and could request any documents he wanted. In Paruzynski's experience, state tax auditors typically worked this way, first looking at specific items, then broadening their search as they saw fit. According to Paruzynski, the auditor did ask for additional documents during the audit and defendant "made every attempt" to comply with those requests. Paruzynski did not recall, however, whether the auditor

specifically asked about defendant's policy of not collecting use taxes on shipping charges in Illinois or whether the issue ever arose during the course of the audit.

¶ 19    Paruzynski identified Defendant's Exhibit No. 5 (the audit file) as "a file that [he] would have created to document th[e] audit process." Although he could not say with certainty which documents were given to the auditor, he testified that the documents in the file all related to transactions that the auditor had asked about. Although the audit largely involved transactions with tax-exempt entities for which no use tax was collected, it was apparent from several documents in the file, including an invoice, screen shots of defendant's electronic records, and printouts of customer ledgers, that, when use tax was collected, it was collected only on the merchandise total and not on shipping charges. Paruzynski testified that, because he believed the company was complying with Illinois law, he had no concerns about the auditor seeing documents of this nature. Nor did he have any reason to ask the auditor about defendant's use tax policy.

¶ 20    Paruzynski stated that at no time while he was employed by defendant did he have any doubt that the company was complying with Illinois tax law, a belief he said was confirmed by the February 27, 2008, audit closing letter which defendant received from the IDOR. The letter simply informed defendant of an unrelated balance that it owed, which defendant paid, and did not mention the taxation of shipping charges. Upon receipt of this letter, Paruzynski stated: "I came to the conclusion that we were handling [the collection of use tax] properly in Illinois."

¶ 21    In its closing argument, relator argued that defendant had a duty to collect and remit use tax on shipping charges in Illinois because, just as in *Kean*, a purchase could not be completed without delivery, making shipping charges inseparable from the purchase price of the merchandise. According to relator, defendant's monthly ST-1 tax returns were false records or statements that concealed its failure to remit use tax on shipping charges. Relator argued that, prior to being served with the complaint in this matter in 2012, defendant acted with reckless disregard by failing to conduct any inquiry into its duty to tax shipping charges in Illinois and, that, after the complaint was filed, defendant continued to act with at least reckless disregard, if not deliberate ignorance, when its chief financial officer Perry Amadon decided to continue the *status quo* without consulting any tax professional. Finally, relator argued that defendant "[p]resented no [c]redible [a]udit [d]efense" because none of its witnesses discussed the taxation of shipping charges with the auditor or could say with certainty that the auditor was shown documents clearly revealing defendant's use tax policy.

¶ 22    For its part, defendant argued that the real issue was not whether it had a duty to collect use tax on shipping charges, but whether relator had met its burden of proving that defendant knowingly concealed an established duty and, at least prior to July 2010, had made false statements in its ST-1 tax returns. Defendant contended that, under the specific facts implicated by defendant's business model, the duty to collect use tax on shipping charges was "uncertain and disputed, not established and clear," and that it reasonably relied on the results of the IDOR's audit to conclude that it was in compliance with Illinois law. Defendant stressed that witnesses' inability to recall how the company adopted its policy concerning the collection of use tax in Illinois did not mean that the decision was made haphazardly. According to defendant, the safeguards it had in place to track changes in state tax laws—including the review of published tax alerts, reliance on the results of state tax audits, and periodic consultation with its lawyers and accountants—demonstrated that it took its tax obligations seriously.

¶ 23    In its opinion issued on October 23, 2014, the circuit court found that relator failed to demonstrate that defendant acted with reckless disregard. Finding the defendant's current and former chief financial officers to be credible witnesses, the circuit court concluded that defendant reasonably relied upon the results of the IDOR audit, as well as its own interpretation of section 130.415, to determine that it had no duty to collect use tax on shipping charges in Illinois.

¶ 24    Relator's motion to reconsider was denied and this timely appeal followed.

¶ 25                                    ANALYSIS

¶ 26    On appeal, relator contends that the circuit court erroneously concluded that defendant did not recklessly disregard its obligation to collect and remit use tax on shipping charges in Illinois—a finding fatal to relator's claim pursuant to the Illinois False Claims Act (740 ILCS 175/1 *et seq.* (West 2010)).

¶ 27    Although we review a circuit court's conclusions of law *de novo*, we defer to its findings of fact following a bench trial—including its findings regarding a party's state of mind—unless they are against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251-52 (2002); *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 54 (2009). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252. We view the evidence in the light most favorable to the appellee (*Cipolla v. Village of Oak Lawn*, 2015 IL App (1st) 132228, ¶ 60) and will neither reweigh the evidence nor reassess the credibility of witnesses (*In re D.L.*, 326 Ill. App. 3d 262, 269 (2004)).

¶ 28    The claim at issue in this case was brought under the Illinois False Claims Act (Act) (740 ILCS 175/1 *et seq.* (West 2010)),[5] an anti-fraud statute modeled on the federal False Claims Act (31 U.S.C. §§ 3729-3733 (2006)). *State ex rel. Beeler, Schad & Diamond, P.C. v. Burlington Coat Factory Warehouse Corp.*, 369 Ill. App. 3d 507, 510-11 (2006). Pursuant to the Act, a party that perpetrates fraud against the State is liable for civil penalties and triple damages. 740 ILCS 175/3(a)(1) (West 2010). Claims may be brought on the State's behalf by the Attorney General or by a private person—referred to as a relator—in a *qui tam* action. 740 ILCS 175/4(a)-(c) (West 2010). In a *qui tam* action, the State may choose to intervene or, as in this case, may instead let the relator proceed with the litigation. 740 ILCS 175/4(b)(4) (West 2010). The relator is considered a party to the action and is entitled to a percentage of the proceeds or settlement if the suit is successful. 740 ILCS 175/4(c)(1), (d) (West 2010).

¶ 29    The Act prohibits not only the knowing presentment to the State of a false claim for payment, but also the knowing concealment or improper avoidance of an obligation to pay or transmit money or property to the State—a so-called "reverse false claim." 740 ILCS 175/3(a)(1)(A), (G) (West 2010). An "obligation" is defined as, *inter alia*, an "established duty, whether or not fixed, arising *** from statute or regulation." 740 ILCS 175/3(b)(3) (West 2010). As we noted above, amendments which took effect on July 27, 2010, eliminated the requirement that a defendant concealing an obligation to pay must make a false record or statement in order to come within the purview of the Act. Compare 740 ILCS 175/3(a)(7)

    [5]The Act is sometimes referred to by its former title, the Whistleblower Reward and Protection Act. 740 ILCS 175/1 (West 2010).

(West 2008), with 740 ILCS 175/3(a)(1)(G) (West 2010). For purposes of the Act, a party "knowingly" conceals or avoids an obligation to pay when it has "actual knowledge" of the obligation, or "acts in deliberate ignorance" or "reckless disregard" of the obligation. 740 ILCS 175/3(b)(1)(A)(i)-(iii) (West 2010). No proof of a specific intent to defraud is required. 740 ILCS 175/3(b)(1)(B) (West 2010).

¶ 30    Relator contends on appeal that the circuit court erroneously applied the "government knowledge defense" to conclude that the mere fact of the IDOR audit negated defendant's *scienter* as a matter of law and "permanently immunized [defendant] from liability." The defense applies where "the government knows and approves of the particulars of a claim for payment before that claim is presented" effectively "negat[ing] the fraud or falsity required" to establish a violation of the Act. *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999). According to relator, even if the evidence established that the State knew that defendant did not collect and remit use tax on shipping charges as a result of the audit, it did not establish that the State knew *and approved* of the practice as part of an ongoing dialogue as required by *Durcholz* and similar cases. See, *e.g.*, *id.* Relator urges us to consider *de novo* whether the circuit court applied the correct legal standard for this defense.

¶ 31    Although relator directs our attention to its closing argument, in which it faulted defendant for failing to conclusively demonstrate that the taxation of shipping charges was an issue discussed with or brought to the IDOR's attention during the audit, defendant argues that relator failed to preserve this issue for appeal by raising it for the first time in its posttrial motion. We conclude that, even if preserved, the argument is based on a flawed reading of the circuit court's October 23, 2014, order. The government knowledge defense was not asserted by defendant at trial. There is furthermore no indication in the record that the circuit court ruled, as a matter of law, that the State's knowledge of defendant's practices precluded relator's claim. Instead, it made a finding of fact on the merits of relator's claim, concluding that relator failed to establish that defendant acted with the requisite state of mind. The court's focus was not on the legal effect of what the State knew, but on what defendant's employees believed about the company's duty to collect and remit use tax in Illinois. Because the government knowledge defense was neither raised at trial nor implicated by the circuit court's order, the authorities cited by relator establishing the elements of that defense are inapplicable.

¶ 32    We instead consider whether the circuit court's findings are contrary to the manifest weight of the evidence. Without reaching the underlying issue of whether defendant had a duty to collect and remit use tax on shipping charges in Illinois, the circuit court concluded that relator failed to prove that defendant knowingly concealed or improperly avoided an obligation to pay money to the State. Specifically, the court concluded that the evidence presented at trial did not establish that defendant acted with reckless disregard. Although few courts in Illinois have addressed the issue, a number of federal courts have considered what it means to act with reckless disregard in the context of an alleged False Claims Act violation. Because the language of the federal and Illinois statutes are virtually identical, we review decisions from these courts as persuasive authority. *State ex rel. Beeler, Schad & Diamond, P.C. v. Target Corp.*, 367 Ill. App. 3d 860, 865 (2006). In doing so, a clear picture of the requisite state of mind emerges.

¶ 33    To begin with, reckless disregard does not encompass mere "[i]nnocent mistakes or negligence." (Internal quotation marks omitted.) *United States v. King-Vassel*, 728 F.3d 707, 712 (7th Cir. 2013). Although the congressional report accompanying the bill that added the

reckless disregard standard to the federal statute defined it as the failure " 'to make such inquiry as would be reasonable and prudent to conduct under the circumstances,' " the report further noted that this is " 'a limited duty to inquire as opposed to a burdensome obligation,' " and " '[o]nly those who act in gross negligence of this duty will be found liable.' " (Emphasis and internal quotation marks omitted.) *United States ex rel. Williams v. Renal Care Group, Inc.*, 696 F.3d 518, 530 (6th Cir. 2012) (quoting S. Rep. 99-345, at 20 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5285-86). Thus, reckless disregard has been described as "an extreme version of ordinary negligence" (*United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997)), "an aggravated form of gross negligence" (*United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 945 n.12 (10th Cir. 2008)), "gross negligence-plus" (*Krizek*, 111 F.3d at 941), and a state of mind lying "on a continuum between gross negligence and intentional harm" (*id.*). Its inclusion in the statute "attempts to reach *** the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted." (Internal quotation marks omitted.) *United States ex rel. Ervin & Associates, Inc. v. Hamilton Securities Group, Inc.*, 370 F. Supp. 2d 18, 41 (D.D.C. 2005) (quoting S. Rep. 99-345, at 20 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5285). Accordingly, a party acts with reckless disregard when it ignores "obvious warning signs" and "refus[es] to learn of information which [it], in the exercise of prudent judgment, should have discovered." (Internal quotation marks omitted.) *Id.* at 42.

¶ 34    Here, the circuit court stated that it found defendant's current and former chief financial officers, Paruzynski, Baus, and Amadon—who all testified that defendant believed its shipping and handling charges were not part of the taxable selling price of the goods defendant sold—"to be credible witnesses." Noting that "[t]he proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws," and that "[t]he purpose of the [Act] is not to penalize frank differences of opinion or innocent errors made despite the exercise of reasonable care," the circuit court concluded that defendant did not act recklessly when it relied both upon the results of the IDOR audit and its own interpretation of section 130.415 to determine that it had no duty to collect use tax on shipping charges in Illinois.

¶ 35    With respect to the audit, the circuit court found that defendant "disclosed to the auditor invoices and transaction records showing sales of goods, use tax collected on those goods, separate charges of shipping and handling, and no use tax collected on those charges," that "[t]he IDOR, *** carefully audited [defendant's] books and records and found no violation of §130.415," and that the IDOR concluded the audit did not indicate in any way that defendant's policies and practices were not in compliance with Illinois law. Taken as a whole, the contents of the audit file and the testimony of defendant's employees support the circuit court's conclusion that defendant reasonably relied on the results of the audit to determine that it was in compliance with Illinois law. The IDOR's audit-initiation letter made clear that the audit was an "Illinois Sales and Use Tax audit" and that the auditor would be checking for compliance with "all" Illinois taxes. Relator presented no evidence indicating that defendant's employees were anything other than forthright with the auditor. Although the focus of the audit may not have been on the taxation of shipping charges, the evidence nonetheless established that the auditor had access to all of defendant's tax records.

¶ 36    Relator argues that no witness testimony or documentary evidence conclusively established that the auditor viewed invoices for taxable transactions from which it would have

known that defendant was not collecting use tax on shipping charges. Defendant presented at least some evidence that the auditor was made aware of the company's policy as a result of the audit, however. Relator correctly notes that only one invoice in the audit file,[6] regarding a customer named GC America, relates to a taxable transaction. We disagree, however, with relator's assertion that this document, on its face, would not have alerted the auditor to the fact that defendant generally did not tax shipping charges for otherwise taxable transactions. As part of the audit, defendant sent GC America a letter stating that it had not charged the appropriate Illinois sales tax. Although defendant never collected use tax for this transaction because GC America indicated that it had already self-assessed and paid the tax on its own, the invoice defendant prepared to accompany the letter clearly indicated the tax defendant was otherwise prepared to collect was based only on the merchandise total.

¶ 37        As the trier of fact, the circuit court was in the best position to make a determination as to witness credibility and the weight to be afforded to the testimony. *In re Estate of Maslowski*, 204 Ill. App. 3d 379, 384 (1990). It concluded that defendant's employees were truthful when they testified both that they believed the auditor was well aware of defendant's use tax policy as a result of the audit and that they concluded at the close of the audit that defendant's practices were in compliance with Illinois law. This was compelling evidence that defendant did not act with reckless disregard with respect to any obligation to pay money to the State.[7] The circuit court's findings were thus not "unreasonable, arbitrary, or not based on the evidence," nor was the opposite conclusion apparent. *Eychaner*, 202 Ill. 2d at 252.

¶ 38        Even without the evidence of the IDOR audit, the court's finding that defendant did not act with reckless disregard was not contrary to the manifest weight of the evidence. Given that, at all relevant times, neither section 130.415, the IDOR's general information letters, *Kean*, nor any other case law that we are aware of addressed the "freight collect" option that defendant's current and former chief financial officers testified was available to its customers through the company's toll-free telephone line, reasonable minds could disagree regarding whether defendant had a duty to collect and remit use tax on shipping charges in Illinois.[8] This court

---

[6]Although relator repeatedly stresses that the audit file was admitted over objection, it makes no challenge to the circuit court's evidentiary rulings on appeal.

[7]Notably, even the IDOR general information letters that relator argues defendant should have reviewed indicate that, when presented with fact-specific questions regarding whether use tax should be collected on shipping charges, the department often defers to its auditors in the field, who it feels are in a better position to know the relevant facts. See, *e.g.*, Illinois Department of Revenue General Information Letter No. ST 03-0103-GIL (July 10, 2003) ("We are unable to respond to the [*sic*] your letter in the manner requested. As you are currently under audit with the Illinois Department of Revenue, we must decline to provide an opinion as to the taxability of the charges about which you are inquiring."). Other letters, which relator relied on in connection with its motion for summary judgment but chose not to introduce at trial, make this deference even clearer. See, *e.g.*, Illinois Department of Revenue General Information Letter No. ST 05-0029-GIL (May 5, 2005) ("In light of the information contained in your letter, we must defer to the determination of the auditor, who is in the best position to make a determination on this matter.").

[8]Indeed, although the amendments to section 130.415 that went into effect earlier this year have no bearing on defendant's state of mind during the time frame at issue here, the numerous additional examples they provide of when an "inseparable link" exists between delivery charges and the selling price of merchandise confirm that the determination is fact-intensive and indicate that the IDOR felt

has held that a knowing violation of the Act cannot occur "when the pertinent area of the law is unclear and specific factual analysis must be completed to determine" a retailer's use tax liability. *State ex rel. Beeler, Schad & Diamond, P.C. v. Ritz Camera Centers, Inc.*, 377 Ill. App. 3d 990, 997 (2007). Such was the case here. We, therefore, cannot say it was arbitrary or unreasonable for the circuit court to believe the testimony of defendant's employees that the company honestly, even if mistakenly, concluded that it had no such duty.

¶ 39    In sum, relator's primary assertion that "[f]or more than a decade, [defendant] failed to make *any* inquiry into its duty to collect and remit taxes on shipping charges" (emphasis added) mistakenly applies an ordinary negligence standard to a cause of action that requires "gross negligence-plus." To be sure, to the extent that defendant's employees believed that the company did not have to tax shipping charges simply because they were separately itemized, they were mistaken. Their failure to periodically review the company's policies absent publicized changes in state laws may or may not have been negligent. Significantly more than an error, mistake, or ordinary negligence is required, however, to demonstrate reckless disregard in the context of a False Claims Act violation. *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) (explaining that the concern in a false claims case is with uncovering fraud, not errors), *overruled on other grounds by United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015); *Hindo v. University of Health Sciences/The Chicago Medical School*, 65 F.3d 608, 613 (7th Cir. 1995) (noting that "[i]nnocent mistakes or negligence are not actionable" as false claims). Relator instead needed to prove that defendant ignored obvious warning signs, buried its head in the sand, and refused to learn information from which its duty to pay money to the State would have been obvious. *Ervin*, 370 F. Supp. 2d at 41-42. The evidence presented in this case, taken as a whole together with all reasonable inferences in defendant's favor, was not manifestly inadequate to support the circuit court's conclusion that relator failed to meet this burden.

¶ 40    Because we affirm the judgment below on the grounds relied upon by the circuit court, we need not consider the alternative arguments raised by defendant on appeal, *i.e.*, whether defendant in fact had a duty to collect use tax on shipping charges or whether it made false statements or records in an effort to conceal such a duty.

¶ 41                                    CONCLUSION

¶ 42    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 43    Affirmed.

---

retailers were in need of additional guidance beyond that previously available. See 40 Ill. Reg. 6130, 6143 (eff. Apr. 1, 2016).